538 So.2d 367 (1989)
STATE of Mississippi, ex rel. Edwin Lloyd PITTMAN, Attorney General, et al.,
v.
MISSISSIPPI PUBLIC SERVICE COMMISSION and Mississippi Power Company.
No. 57740.
Supreme Court of Mississippi.
January 4, 1989.
Rehearing Denied March 8, 1989.
*368 Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Frank Spencer, Asst. Atty. Gen., and W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, Martha Bergmark, Hattiesburg, Jesse C. Pennington, John H. Holloman, III, Robert M. Arentson, Jr., Watkins, Ludlam & Stennis, Jackson, for appellants.
Richard Wise, Jackson, Ben H. Stone, James S. Eaton, Eaton & Cottrell, Gulfport, for appellees.
En Banc.
SULLIVAN, Justice, for the Court:
On June 17 and 18, 1986, a hearing was held pursuant to an Order of the Mississippi Public Service Commission to Mississippi Power Company to file a performance evaluation plan or show cause why it could not comply. The State of Mississippi, Ex rel. Edwin Lloyd Pittman, Attorney General, Southeast Mississippi Legal Services Corporation, Mississippi Legal Services Coalition, General Motors Corporation, and Peavey Electronics Corporation intervened. On September 18, 1986, the Mississippi Public Service Commission issued its final order adopting and implementing, as a new rate, the Performance Evaluation Plan submitted by Mississippi Power Company. The intervenors/appellants appeal this order, assigning a total of seven errors. The Mississippi Public Service Commission and Mississippi Power Company, appellees, cross-appeal that the appeal should be dismissed, as this Court lacks subject matter jurisdiction over the direct appeal. In light of our disposition of this case, we address only one of the appellants' assignments and the appellees' cross-appeal.

FACTS
Shortly before November 5, 1985, Mississippi Power Company (MPC) filed with the Mississippi Public Service Commission (MPSC or Commission) a notice of intent to increase rates. On November 5, 1985, the Commission issued an order to MPC to file a Performance Evaluation Plan (PEP or plan) or to show cause why it could not comply. That order, in pertinent part, states:
* * * * * *
3. Under the law rates are not conditioned upon the operating efficiencies and performance of the company although such performance directly affects the revenues of the company and therefore the need for additional rates. This Commission has studied and intends to adopt some new method which will allow it to consider and monitor performance and efficiency of a company and to set rates accordingly.
4. MPC has recently filed a notice to increase rates, and it is timely and reasonable to begin the study and establishment of a new Performance Evaluation Plan with that company.
5. MPC should ... develop ... a plan which permits this commission to establish *369 rates based upon a consideration of the company's performance.
IT IS, THEREFORE, ORDERED that MPC ... submit ... a procedure or plan whereby this Commission can, if adopted, evaluate the performance of MPC's utility responsibility and obligations, from time to time, and based upon those performance evaluations to determine the reasonableness of MPC's rates ...
On March 17, 1986, MPC filed its version of the plan at issue here. On April 4, 1986, the Commission gave notice to intervenors and to the public directing them to file comments by May 6, 1986. By the end of April, 1986, the Attorney General (AG), General Motors Corporation (GMC), Mississippi Legal Services Coalition and Southeast Mississippi Legal Services (collectively, Legal Services), had filed their notices of intervention. This cause was set for public hearing on June 17 and 18, 1986. On June 13, 1986, GMC filed a motion to dismiss the proceeding based on the Commission's lack of subject matter jurisdiction or statutory authority.
As scheduled, the hearing on the show cause order was held on June 17 and 18, 1986. The first major item on the agenda was GMC's motion to dismiss. Chairman Cochran, in denying the motion, stated that he was "of the opinion that this Commission does have the authority to review" the PEP Plan. Counsel for the AG, in response to the denial of the motion to dismiss, stated that he agreed that the Commission had the authority to review new ratemaking techniques, but that if MPSC wanted to implement the plan, the appropriate course of action would be to go to the legislature for a change in the law. Chairman Cochran then stated that he did not think that they were here to "necessarily adopt a plan" but rather to review it. Then, he stated, "If we think it has merit in some form, then certainly we'll take the appropriate action, be it going to the legislature, if we need to, to have some adjustments in the existing laws to adopt a new type of rate setting process." The record next reflects much confusion about the nature of the proceeding and the burden of proof. Counsel for Legal Services expressed concern about the possibility of this proceeding merging into a rate filing. Chairman Cochran responded:
I'm not prepared for a rate filing either ... I'm prepared to review this proposed evaluation program and see if it has merit and if there might be some alternatives or some other source of efforts to set rates other than what we commonly refer to if somebody files a rate case.
The AG's representative then requested a ruling by the Commission that this proceeding was purely investigative and would not result in a rate change. That request was denied. Extensive examination and cross-examination of all witnesses on various aspects of the PEP Plan followed. On August 7, 1986, MPSC issued an order adopting and implementing PEP with some modifications, with Commissioner Snyder dissenting.

THE PEP PLAN
The plan operates by comparing, on a quarterly basis, MPC's actual earned return on equity for the preceding twelve months with the returns of utilities with similar risks. The utilities chosen for comparison are those with the same bond rating as MPC and the plan excludes any utilities that have suspended dividends. The average cost of common equity capital of this group of utilities is calculated using a Discounted Cash Flow (DCF) model contained in the PEP Plan. This average is called the Benchmark Return on Equity (BROE or Benchmark) and represents the percentage return on equity which MPC should have received by comparison to similar companies for the past twelve months. MPC's actual Retail Return on Equity (RROE) for the preceding twelve months is calculated by using data from the utility's books. If, in any quarter, MPC's RROE is above or below the Benchmark, an adjustment in revenues might be made depending on how well the utility has performed. However, the plan places a two percent (2%) cap on any increase or decrease in revenues per quarter.
MPC's performance rating is determined through the use of seven indicators. All of *370 these indicators were determined by formulae developed by MPC. Each of these indicators is given a percentage, so that the total weight is one (1). The weight given each indicator was decided by MPC with "fairness to all concerned in mind" but without any formula because no such formula exists.
Construction performance, measures how well the company has estimated the cost of completing any construction projects which will be included in the retail rate base and which will require three years or less to complete. The plan provides that, if a project should "substantially" increase or decrease in scope, the company may petition the Commission for approval to change the certificated estimate. Construction performance is weighted at.11.
The second indicator of MPC's performance is contribution to load factor. This indicator "measures the effectiveness and contributions of the company's efforts to utilize its facilities." Contribution to load factor is weighted at .11. The third indicator is customer satisfaction. This indicator is based on a survey conducted twice a year by a "nationally recognized survey firm" in which the firm asks three questions and then asks the customer to respond to three statements by indicating to what degree they agree or disagree with the statement. This indicator is weighted at .15.
The fourth indicator is equivalent availability which measures the "average percentage of time the fossil steam electric generating units operated by the company were ready and available to produce electricity" during the preceding twelve months. Outages beyond MPC's control are not included in the calculations. Equivalent availability is weighted at .16.
The fifth indicator is residential cost which measures how MPC's charges compare with the rates charged by other utilities in the Southeastern Electric Exchange. The rates charged by other companies are provided by NARUC Residential Electric Bills studies which are prepared twice a year. This indicator is weighted at .20.
The sixth indicator is safety and measures MPC's safety performance over the last twelve months based on the number of: employee accidents; lost time cases; days lost; and, fleet accidents. Safety is weighted at .11.
The seventh indicator is service reliability which measures reliability based on customer interruptions. Some interruptions are excluded. Reliability is weighted at .16.
When MPC's performance under these indicators is tallied, MPC's total performance rating combined with the return on equity comparison described above provide the basis for determining whether an increase/decrease in revenues is appropriate or whether MPC's revenues should remain the same. In other words, if MPC is performing well, but is also above the Benchmark Return on Equity, it will not suffer a decrease in revenues if it is within the range of no change. Conversely, if MPC is performing poorly and its actual return on equity is below the Benchmark, but within the range of no change, it will not be allowed an increase in revenues. On the other hand, if MPC's actual return on equity falls outside the range of no change, either above or below the Benchmark, then a decrease or increase in revenues would be mandated, as long as any decrease or increase did not result in more than a two percent (2%) change in annual revenues.

I.

DOES THIS COURT HAVE JURISDICTION OVER THIS DIRECT APPEAL?
The appellees, MPC and MPSC, argue that, under the public utilities statute governing appeals procedures, aggrieved parties may appeal directly to this Court, only those final Commission orders resulting from proceedings instituted by a utility, involving a filing for a rate change. The argument continues that, since the instant cause was not instituted by a utility, it cannot be one involving a filing for a rate change, and, therefore, this Court lacks subject matter jurisdiction to hear a direct appeal.
*371 In applying a statute, we look first to that statute's own words. Pinkton v. State, 481 So.2d 306, 309 (Miss. 1985); Back-Acres Country Club, Inc. v. Mississippi State Tax Commission, 216 So.2d 531, 534 (Miss. 1968); Russell v. State, 231 Miss. 176, 181, 94 So.2d 916, 917 (1957). Rules of construction are inappropriate, and, parenthetically, unnecessary, where the words of the statute are plain and unambiguous. Pinkton, 481 So.2d at 309; MISS CAL 204, Ltd. v. Upchurch, 465 So.2d 326, 329 (Miss. 1985); Clark v. State ex. rel. MS. State Med. Ass'n, 381 So.2d 1046, 1048 (Miss. 1980); Mississippi Power Co. v. Jones, 369 So.2d 1381, 1388 (Miss. 1979). The statutory language, with which we are faced in the instant case, falls into this category.
In 1983 the legislature amended Article VI, Section 146 of the Mississippi Constitution, such that it now provides:
The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals and shall exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law. The legislature may by general law provide for the Supreme Court to have original and appellate jurisdiction as to any appeal directly from an administrative agency charged by law with the responsibility for approval or disapproval of rates sought to be charged the public by any public utility. The Supreme Court shall consider cases and proceedings for modification of public utility rates in an expeditious manner regardless of their position on the court docket.
After ratification by the electorate, this amendment became part of the constitution in January, 1984.
Section 77-3-72(1), Miss. Code Ann. (Supp. 1988), in pertinent part provides:
Any party aggrieved by any final finding, order or judgment of the Commission in any utility rate proceedings involving a filing for a rate change of any public utility ... shall have the right, regardless of the amount involved, of direct appeal to the Mississippi Supreme Court.
This section has been in effect since public adoption of the 1983 Amendment to Section 146 (Mississippi Constitution of 1890) in January, 1984.
The "part[ies] aggrieved" are the Attorney General, Legal Services, GMC, and Peavey. They satisfy the requirement of "any party." The Commission entered its order adopting and implementing the PEP Plan, thereby satisfying the second requirement of the statute. The PEP Plan was filed by MPC at the Commission's request after MPC had filed its notice of intent to change rates, and, as shall be more fully developed below, the PEP Plan was "a filing for a rate change of" MPC.
We are of the opinion, and therefore hold, that this appeal satisfies the requirements of Miss. Code Ann., § 77-3-72(1) (Supp. 1988). This Court properly has jurisdiction over this direct appeal.

II.

THE ADOPTION OF PEP
Under this assignment we are called upon to resolve two questions. First, whether PEP is a rate or, simply, a rate-making tool. Second, whether adoption of PEP as a rate exceeds the Commission's statutory authority.
As is well established, this Court's review of an administrative agency order is limited. A Commission order shall not be set aside in whole or in part except for errors of law, unless the court finds it is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of statutory authority or violates constitutional rights. Miss. Code Ann., § 77-3-72(4) (Supp. 1988); Miss. Public Service Commission v. So. Central Bell Tel., 464 So.2d 1133, 1135 (Miss. 1984); Miss. Public Service Commission v. Miss. Power Co., 429 So.2d 883, 891 (Miss. 1983); Miss. Public Service Commission v. Miss. Power Co., 337 So.2d 936, 939 (Miss. 1976); Miss. State Tax Commission v. Miss.-Ala. State Fair, 222 So.2d 664, 665 (Miss. 1969). Furthermore, an order of the Public Service Commission comes to this Court with the presumption of validity. Miss. Public *372 Service Commission v. So. Central Bell Tel., 464 So.2d at 1135.
Collectively the appellants argue that the Commission's statutory power is limited to determining just and reasonable rates and does not extend to adopting new rate setting methods. Second, they argue that the method adopted, PEP, directly contravenes certain statutory procedures and generally circumvents the utilities regulation statutes.
MPC and the Commission counter that the Commission has full statutory authority to adopt PEP. Their position is that the appellants' failure to understand that PEP is the rate, rather than a ratemaking method, leads the appellants to their mistaken belief that the Commission acted outside its statutory authority. Appellees rely on cases standing for the proposition that the objective of rate regulation is the result, just and reasonable rates, and not the methods employed to reach that result and that no particular formula is necessarily binding on the Commission. See Southern Bell Tel. v. Miss. Public Service Commission, 237 Miss. 157, 113 So.2d 622, 647 (1959), quoting Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942), and quoting Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).
The appellees also rely heavily on the Alabama Supreme Court's decision in Ala. Metallurgical Corp. v. Ala. Public Serv. Com'n., 441 So.2d 565 (Ala. 1983). They quote the following:
The appellants' mistaken characterization of the nature of Rates RSE and CNP has led to several erroneous conclusions regarding the operation of the rates within the traditional rate making structure. RSE and CNP are fixed rate formulae. Courts throughout the United States have recognized the distinction between a fixed formula and the mathematical factors or adjustments, which are the mathematical products of the operation of that formula. These Courts have held that the formula is the rate as opposed to the mathematical computations under the formula.
Ala. Metallurgical, 441 So.2d at 571-72.
The Alabama Court went on to hold that the rates in question were statutorily authorized formulary rates. Finally, the appellees note that in 1988 the legislature amended the definition of "rate" found in Miss. Code Ann., § 77-3-3(e) (Supp. 1988), to include as a rate "the formula or method by which such may be determined."

A.

IS PEP THE RATE?
We have no difficulty accepting MPC and MPSC's position that the formula is the rate. In Southern Bell Tel. v. Miss. Public Service Commission, 237 Miss. 157, 113 So.2d 622 (1959), we held that the Commission is not bound to the use of any particular formula in reaching the statutorily required result of "just and reasonable" rates such as will yield a fair rate of return to the utility furnishing service. Southern Bell, 113 So.2d at 647-49.
This rule has been consistently applied. The reasonableness of rates charged, or to be charged, by a public utility is not determined by definite rules and legal formulae, but is a fact question requiring the exercise of sound discretion and independent judgment in each case. Miss. Public Service Commission v. So. Central Bell Tel., 464 So.2d 1133, 1135 (Miss. 1984); Miss. Public Service Commission v. Miss. Power Co., 337 So.2d 936, 938 (Miss. 1976); Miss. Power Co. v. Miss. Public Service Commission, 291 So.2d 541, 556 (Miss. 1974).
We are further assisted in our determination of this issue by the legislature's 1988 clarification of Miss. Code Ann., § 77-3-3(e). In construing a statute, we may consider later acts of the legislature to ascertain the correct meaning of a prior statute. Grant Center Hosp. v. Health Group, etc., 528 So.2d 804, 810 (Miss. 1988). On the above authority, we hold that, under the public utilities regulations statutes, this formula, PEP, is the rate.

*373 B.

DOES ADOPTION OF RATE PEP EXCEED THE COMMISSION'S STATUTORY AUTHORITY?
Miss. Code Ann., § 77-3-5 (1972), provides that the Public Service Commission shall have exclusive original jurisdiction over the intrastate business and property of public utilities subject to the limitations imposed in, and the provisions of Miss. Code Ann., § 77-3-1, et seq. This legislative grant of authority places those limitations on the Commission's power and authority that this Court has uniformly placed on administrative agencies. We have stated that administrative agencies have only such powers as are expressly granted to them, or necessarily implied in their grant of authority. State ex. rel. Pittman v. Miss. Public Service Commission, 520 So.2d 1355, 1358 (Miss. 1987); Farrish Gravel v. Miss. Highway Commission, 458 So.2d 1066, 1068 (Miss. 1984); Strong v. Bostick, 420 So.2d 1356, 1361 (Miss. 1982); Golding v. Salter, 234 Miss. 567, 107 So.2d 348 (1958). Furthermore, any such power exercised must be found within the four corners of the statute under which the agency operates. Bostick, 420 So.2d at 1361; Miss. Milk Com'n. v. Winn-Dixie, 235 So.2d 684, 688 (Miss. 1970). If this authority is not found to be expressly granted or necessarily implied, then the administrative agency's decision is void. Farrish Gravel, 458 So.2d at 1068.
In defining "necessary implication" in Bostick, we stated:
"The term is more restrictive than mere `implication;' it refers to a logical, not a physical, necessity, and implies that no other interpretation is permitted by the words of the instrument construed; and so it has been defined as meaning an implication which results from so strong a probability of intention that an intention contrary to that imputed cannot be supposed; that which leaves no room to doubt; ..."
Bostick, 420 So.2d at 1361, quoting 42 C.J.S. Implication at 405 (1944).
In further delineating an administrative agency's authority we have held that it cannot operate to supersede or circumvent the statutes under which the agency operates or be inconsistent with the statutes. State ex rel. Pittman v. Miss. Public Service Commission, 520 So.2d at 1358, citing Capital Electric Power Ass'n. v. Miss. Power & Light Co., 240 Miss. 139, 153, 125 So.2d 739, 744 (1961); Miss. State Tax Commission v. Reynolds, 351 So.2d 326, 327 (Miss. 1977).
It is this Court's opinion that in adopting Rate PEP the Commission has acted outside its statutory authority. First and foremost, Rate PEP is an utter abrogation by the Commission of its statutory responsibilities and a relinquishment of control to the very entity the Commission is charged by law to regulate.
Miss. Code Ann., § 77-3-2 (Supp. 1988), outlines the purposes of and policy behind the legislature's grant of regulatory power to the Commission. This section in part provides that the public policy is:
(a) To provide fair regulation of public utilities in the interest of the public;
(b) To promote the inherent advantage of regulated public utilities;
(c) To promote adequate, reliable and economical service to all citizens and residents of this State;
(d) To provide just and reasonable rates and charges for public utility services without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices and consistent with long-term management and conservation of energy resources by avoiding wasteful, uneconomic and inefficient uses of energy;
The necessity for such a policy was well articulated in State ex. rel. Allain v. Miss. Public Service Commission, 435 So.2d 608 (Miss. 1983):
The duties of the Commission are awesome and their responsibilities great in a most difficult, ongoing situation. Mississippi Code Annotated, § 77-3-39 (1972), authorizes the Commission to establish rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. *374 In effect the Commission is the counterpart of the market place by which other businesses are measured. This is so because public utilities are monopolies engaged in the business of furnishing necessary services to the public. Obviously, the legislative intent in creating the Public Service Commission was to interpose an authoritative body between the rate payers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served. The crucible of the competitive market place to which business concerns, other than monopolies, are necessarily exposed is thus avoided so that economic waste by overlapping and duplicating services will not occur.
State ex rel. Allain, 435 So.2d at 612.
The result of Rate PEP is to return MPC to its position as a virtually "pure" monopoly with the attendant "great potential for the abuse of economic power" and, perhaps, inefficiency. Miss. Public Service Commission v. Miss. Power Co., 429 So.2d 883, 909 (Miss. 1983) (Justice Broom dissenting).
Without resort to differentiations between Rates RSE/CNP and Rate PEP or differentiations between Alabama's statutory scheme and ours, we decline to follow Ala. Metallurgical Corp., 441 So.2d 565 (Ala. 1983). We are convinced that the public interest is not protected by a rate that is subject to quarterly adjustments of the costs of utility services, which adjustments are determined by revenue and expense figures supplied by the utility. The fact that MPC's books are regularly audited does not bring Rate PEP into conformity with the purposes of the statute because many business practices and decisions which might be acceptable in the free market may not adequately protect the public interest when engaged in by a monopoly. Nor does the fact that the Commission reviews each adjustment give PEP the necessary legitimation. We have accepted the Commission's argument that PEP results in the mechanical application of numbers to a formula. This established, the Commission's review appears to be a mere rubber stamp.[1]
Something akin to MPC's Performance Evaluation Plan might well be a useful tool for the Commission to utilize in the context of the traditional ratemaking process, but as a rate it vests unbridled discretion in the utility. Having determined that Rate PEP violates this State's public policy and the statutes delineating that policy, we turn to consideration of several specific statutory provisions circumvented by PEP.
MPC and MPSC take the position that Rate PEP does not circumvent the statute because Rate PEP was adopted following a Commission initiated request for a rate change and, therefore, the procedures dictated by the statutes governing utility initiated rate changes do not apply. We do not agree. Such an interpretation has allowed the appellees to circumvent the requirements of the statutes and to establish a rate which acts inconsistently with those statutes.
Miss. Code Ann., § 77-3-41 (Supp. 1988), in pertinent part provides, "whenever the Commission, after hearing had pursuant to the procedure set forth in Section 77-3-39 and Section 77-3-47..." (Emphasis added). Section 77-3-47 in turn includes no procedures for Commission initiated rate changes. It does include a requirement of and procedures for a prehearing conference which must be held prior to any hearings held after a utility initiated request for a rate change. In contrast, §§ 77-3-39 and 77-3-37 provide extensive procedures and evidentiary prerequisites for hearings on utility initiated rate changes.
The plain and unambiguous meaning of the above quoted language in Miss. Code Ann., § 77-3-41 (Supp. 1988), is that the requirements of both § 77-3-39 and § 77-3-47 must be satisfied whenever *375 there is a request for a rate change, regardless of who initiates it. In other words, "and" is conjunctive and means what its says. This is also the most reasonable reading of § 77-3-41 in light of the fact that, otherwise, the statutes would not provide any procedures for hearings on Commission initiated rate changes. This being the case, Rate PEP must satisfy the statutes in spite of the fact that it grew out of a Commission initiated proceeding.
Miss. Code Ann., § 77-3-39(1) in part provides, "the commission shall hold such hearing in every case in which the change in rates constitutes a major change in rates, as defined in Section 77-3-37(10)." Miss. Code Ann., § 77-3-37(10), in turn provides:
"Major changes" means (a) an increase in rates which would increase the annual revenues of such public utility more than the greater of One Hundred Thousand Dollars ($100,000.00) or two percent (2%) ...
Rate PEP provides that no quarterly adjustment shall result in more than a two percent (2%) change in annual revenues. This provision has the potential of allowing MPC to enjoy up to an eight percent (8%) increase in revenues per year or to be subjected to an eight percent (8%) decrease in revenues. Thus, Rate PEP circumvents the public hearing requirement for all cases involving any rate increase which would result in greater than a two percent (2%) increase in annual revenues. We would also point out that such an arbitrary cap could act to deprive the public of a just and reasonable rate or to deprive the utility of a fair return.
Second, Rate PEP establishes that only 75 percent of firm capacity sales will be credited to ratepayers. In its order implementing PEP the Commission stated:
In prior proceedings, this Commission has required MPC to credit all revenues derived from firm capacity sales to operating revenues. The effect of this has been to reduce the amount of revenues that are required from retail customers and thereby to reduce rates. This has been a substantial benefit to MPC's customers in the past.
We fail to understand how a 25 percent windfall to MPC's shareholders furthers the statutory mandate of Miss. Code Ann., § 77-3-33(1) that rate charges be just and reasonable. Ratepayers provide the necessary economic resources which enable MPC to produce the energy for sale to interstate customers. Furthermore, the lure of this 25 percent profit could lead MPC to increase firm capacity sales, at least up to the point where the 75 percent which is credited to ratepayers reaches the two percent (2%) annual revenues increase cap. In the long run, the utility might resort to offsetting the increase in revenues with new costs, such as new construction. Ultimately, the ratepayer will bear those costs.
Finally, Rate PEP relegates to cost-of-service 50 percent of all charitable contributions made by MPC. Miss. Code Ann., § 77-3-79 (Supp. 1988), provides that, "[r]easonable, charitable or civil contributions shall be allowed as costs of service not to exceed amounts established by regulations adopted by the Commission." Section 77-3-79 includes a reasonableness requirement. Such an arbitrary allocation of this percentage of charitable contributions to cost-of-service cannot be categorized as reasonable. This is particularly true, where the 50 percent is an ever changing amount of real dollars. Furthermore, this cost, up to 50 percent of the amount allowed by the IRS, could conceivably be used to offset the increase in firm capacity sales revenue. We have addressed only a few of the numerous statutory deficiencies pointed out by the appellants.
In short, PEP violates the general public policy of utilities regulation in this State and circumvents specific statutory provisions. Therefore, the Commission's order adopting and implementing PEP is void and of no effect. This cause is remanded for consideration of the effect of this ruling on any revenue adjustments obtained by MPC under the plan.
REVERSED AND REMANDED.
*376 ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.J. and ANDERSON and ZUCCARO, JJ., concur.
ROBERTSON, J., dissents.
PRATHER, J., not participating.
ROBERTSON, Justice, dissenting:
I have studied this case intently and intermittently and am disturbed by our decision. Utility rate litigation has become sport, a vent for passions. Each contest satiates for the moment, then fuels the appetite for further fight. We shrink from the thought of the season ending.
I am hard pressed to imagine a more inefficient, haphazard approach to utility rate making than our state has witnessed in recent years. The transaction costs are enormous and must be borne by the public, rate paying or tax paying variety. Moreover, the system penalizes efficient performance by the utility and rewards inefficiency. Our Public Service Commission presents an innovative and promising  and legal  way out and we deliver a stiff left to the jaw.
But first a point on which we seem to agree, and for which I must applaud my colleagues in the majority. Of course a formula may be a "rate" within Miss. Code Ann. § 77-3-41 (Supp. 1988). Every rate that has ever received PSC approval has been a formula of one sort or another, unless I fail to understand the term. Our past utterances suggest to my mind that we have always thought "rate" and "formula" all but synonymous. State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d 387 (Miss. 1989); State ex rel. Allain v. Mississippi Public Service Commission, 435 So.2d 608, 614-15 (Miss. 1983). That today's formula is more complex than what we have known does not deprive it of its being as a rate, no more than calculus by its difficulty is ousted from mathematics. I only regret the majority's failure to face the implication of holding the formula the rate: affirmance.
We have preached and preached that the legislative actions of the Public Service Commission are entitled to great weight and deference. Mississippi Public Service Commission v. South Central Bell Telephone Company, 464 So.2d 1133, 1135-36 (Miss. 1984). We preach that PSC orders are presumptively valid, that we should stay our hand when we can. Mississippi Public Service Commission v. Mississippi Power Company, 429 So.2d 883, 887 (Miss. 1983). We have preached a variant of that sermon: where an administrative agency has construed a statute it is empowered to administer, we give that agency construction great weight and deference. State Tax Commission v. Edmondson, 196 So.2d 873, 877 (Miss. 1967); L.H. Conard Furniture Co. v. Mississippi State Tax Commission, 160 Miss. 185, 194-95, 133 So. 652, 655 (1931). I am surprised we would forget the point, for we were reminded of it only last year on the occasion of our last mistake in a utility rate case. Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. ___, ___-___, 108 S.Ct. 2428, 2443-45, 101 L.Ed.2d 322, 344-45 (1988) (Scalia, J., concurring).
The majority's reading of the public policy statute, Miss. Code Ann. § 77-3-2 (Supp. 1988), escapes me. After a few truisms of administrative law that none would find offensive, we are told Rate PEP is "an utter abrogation" by the PSC, "a relinquishment of control to the very entity the Commission is charged by law to regulate." And later, Rate PEP "vests unbridled discretion in the utility." Such rhetoric appears odd juxtaposed against the summary of Rate PEP set out in the majority's pages 369 to 370. When the detailed and so obviously well thought out plan is read in full (and I attach a copy), the odd becomes the bizarre.
Our refusal to respect the PSC reading of the statutes is difficult on another score. We have said that the reasonableness of rates is not a function of any definite or fixed formula or rule. Mississippi Public Service Commission v. South Central Bell Telephone Co., 464 So.2d 1133, 1135 (Miss. 1984); Mississippi Public Service Commission v. Mississippi Power Company, 429 So.2d 883, 887 (Miss. 1983). We *377 normally accord the PSC great latitude. The problem cannot be that the consumer's light bill changes without a rate hearing, as this happens all the time under perfectly legal fuel adjustment clauses,[1] power purchase adjustment clauses, gas purchase clauses, tax adjustment clauses, and the like. Alabama accepts the view I would adopt in a case that bears reading, Alabama Metallurgical Corp. v. Alabama Public Service Commission, 441 So.2d 565, 571-73 (Ala. 1983), and we have it on good authority that the sun also rises in Alabama.
As the PEP Plan is within Section 77-3-41's permissible range of authority, I find of moment the PSC's reasons for its approval.
The Commission ... ordered the development of this Plan because the traditional rate case means of setting rates is extremely costly, time consuming, technical and does not afford the public adequate input. A typical rate case will cost the state, the Company and the intervenors hundreds of thousands of dollars and can easily last three or more years. The result of that procedure has been often criticized by this Commission, the public, the legislature and just about everyone else involved. It appears that the old rate case system only benefits the expert consultants and lawyers which each party must hire.
But there is a more basic point. As a regulated utility Mississippi Power Company is not subject to ordinary market forces. Ordinarily markets operate to reward enterprise when it performs well. The penalties of extinction and bankruptcy follow poor performance. But the system we cling to stands common sense on its head, as it penalizes top performance and has within it the propensity to reward poor performance. The PSC put it this way:
The Show Cause Order was issued because this Commission has for some time felt that the traditional method of utility rate making did not adequately consider the Company's performance in setting rates and did not recognize that a utility which performs its utility functions well and efficiently will be able to provide better service to its customers at lower rates while at the same time earning reasonable returns for its shareholders. Under traditional rate making, a utility was allowed to earn a higher rate of return than other utilities only when it was considered by investors to be more risky. Many times this perception by investors that a utility was more risky indicated and resulted from the fact that the utility was not performing its utility functions well.
Our dependence on uninterrupted service mandates regulation. Not even the most zealous idealogue seriously suggests deregulation of public utilities. But this does not mean we may not develop a Performance Evaluation Plan that mimics the market. The PEP Plan we strike down does nothing less than offer our rate paying public the benefits of the market without its costs. That such an ambitious plan may not work still leaves it far superior to what we are left with that we know does not work. If the PSC's reading of the word rate were not legally permissible, I would not hesitate to say so. But it is permissible legally and linguistically and that is all that must be shown. I would affirm.
I append the Public Service Commission's Order the Court this day reverses, for it possesses power that may yet light our way.

APPENDIX

BEFORE THE MISSISSIPPI PUBLIC SERVICE COMMISSION

U-4761

August 7, 1986
In re: Order of the Mississippi Public Service Commission to Mississippi Power Company to File a Performance Evaluation Plan or Show Cause Why it Cannot Comply

ORDER
This cause came on to be heard on Show Cause Order issued by the Mississippi Public *378 Service Commission, hereinafter referred to as the "Commission", to Mississippi Power Company, hereinafter referred to as the "Company" or as "MPC", and the Commission after duly hearing and after considering all oral and documentary evidence in the proceeding, does find and Order as follows:
This Commission has jurisdiction of this matter by virtue of its subject and the authority conferred upon this Commission by the laws of the State of Mississippi.
On November 5, 1985, this Commission issued to the Company a Show Cause Order directing the Company to develop and file for consideration by this Commission a plan or procedure which, if adopted, would permit this Commission to evaluate the performance of the Company's utility responsibilities and obligations from time to time, and based upon those performance evaluations, to determine the reasonableness of the Company's utility rates subject to the jurisdiction of this Commission, or to show cause why the Company could not comply with that order. The Show Cause Order was issued because this Commission has for some time felt that the traditional method of utility rate making did not adequately consider the Company's performance in setting rates and did not recognize that a utility which performs its utility functions well and efficiently will be able to provide better service to its customers at lower rates while at the same time earning reasonable returns for its shareholders. Under traditional rate making, a utility was allowed to earn a higher rate of return than other utilities only when it was considered by investors to be more risky. Many times this perception by investors that a utility was more risky indicated and resulted from the fact that the utility was not performing its utility functions well.
The Commission further ordered the development of this Plan because the traditional rate case means of setting rates is extremely costly, time consuming, technical and does not afford the public adequate input. A typical rate case will cost the state, the Company and the intervenors hundreds of thousands of dollars and can easily last three or more years. The result of that procedure has been often criticized by this Commission, the public, the legislature and just about everyone else involved. It appears that the old rate case system only benefits the expert consultants and lawyers which each party must hire.
After issuance of the Show Cause Order, the Company worked on the development of such a plan with periodic direction supplied by the Commission and the Public Utility Staff. In MPC's response to the show cause order, it stated that MPC was unable to find any plan which is similar to the one proposed by the Commission. This is consistent with the findings of this Commission, the Public Utility Staff and several of the intervenors in this cause. In fact, no plan has been found which even seeks to examine the overall performance of a company as is proposed by this Commission. A number of plans adopted in other jurisdictions, namely New Mexico, Alabama, Michigan, and others, have incorporated measurements of single aspects of a company's financial performance to accomplish special purposes, but none has sought to measure the overall performance of the Company on the basis of a cross section of performance indicators. The performance indicators and the matrix arrangement in this Plan are unique and will allow this Commission for the first time to consider systematically how well the Company is serving its customers as a part of the process of setting rates.
This is a new and innovative rate making approach which should insure the lowest possible rates for the ratepayers while assuring a reasonable rate of return for the stockholders. The Commission, however, assures all parties and the ratepayers it serves that the very innovative nature of the Plan may require adjustments from time to time and this Commission has the full power to and will adopt any necessary changes to insure the Plan's proper operation.
On March 17, 1986, MPC responded to the Show Cause Order by filing its proposed plan. On April 4, 1986, this Commission requested that all interested parties *379 intervene and file comments by May 6. Notice was given by registered mail to the Attorney General of the State of Mississippi, South Mississippi Legal Services, and all other parties participating in MPC's last major rate case. Notice was also published in a newspaper of general circulation in Mississippi. Following that notice, the Attorney General of the State of Mississippi, Southeast Mississippi Legal Services and Mississippi Legal Services Coalition (which, together will, be referred to as Legal Services), and General Motors Corporation all intervened. Prehearing comments were filed by Mississippi Power and Light and testimony were filed by the Attorney General and Legal Services. At the hearing, counsel for General Motors announced that he represented Dupont and Peavy Corporation, who were joining General Motors in the intervention.
Opportunity was afforded to all parties to file data requests. In total, 151 such requests were made to the Respondent MPC and response given.
On May 5, 1986, this matter was set for hearing before this Commission on June 17 and 18, 1986. At that hearing, all parties were given an opportunity to be heard. The Company, the Attorney General, Legal Services and the Public Utility Staff were all allowed to file testimony through the time of the hearing. Additionally, General Motors, who elected not to prefile any testimony, offered testimony live at the hearing. All witnesses were offered for cross examination.
This Commission has considered the proposal submitted by the Company and the comments and suggestions of all parties concerning this matter. This Commission wishes to express its appreciation to all for the cooperative manner in which their assistance has been offered. This Commission recognizes that as we approach a new and innovative method of rate making, the assistance and cooperation of parties will be needed to insure that the new method is fair and reasonable to all parties. The response of the Company to the Show Cause Order in this matter provides a good starting point for the development of such a new and innovative, comprehensive Performance Evaluation Plan, but as pointed out by the Staff and the valuable comments and testimony of the intervenors, the Company's proposal is entirely too favorable to the Company and must be modified in order to be fair and reasonable to all parties. This Commission is always aware that Bluefield Water Works v. Public Service Commission of the State of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) and Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), as well as the decisions of the Mississippi Supreme Court require that rates yield a fair return on the reasonable value of utility property and that they be at the lowest reasonable rate to the customer. We find that the Plan, which we hereby adopt, yields such a result, and further allows this Commission to carefully monitor the performance of the Company and to use this to provide penalty or reward based upon how well the Company is operated.
Whenever a commission undertakes something that is new and innovative, it must do so with caution. Several of the intervenors request we proceed with caution and others suggest that the Commission not undertake such a process at all. All of the intervenors, however, expressed support in concept for a plan which based the Company's returns on performance. While this Commission recognizes the need to proceed with caution, we also recognize that someone must take the first step toward innovative improvement. We believe that this is such a first step. We also believe that the Plan as substantially modified by us in this Order will accomplish the objectives sought to be attained and will yield a fair result to all parties. At the very outset, however, this Commission cautions that it will diligently review the operation of the Plan and will not hesitate at any time to modify any portion or discard the Plan in its entirety if it is found that the Plan does not function as it should and yield a fair result.
Prior to the Company's filing its response to our Show Cause Order, the Public Utility Staff undertook an investigation *380 of performance plans. After the Company's filing, the Staff proceeded to study the details of that proposal and, in response to the request of this Commission, has submitted comments and filed testimony which have been very helpful to this Commission in evaluating MPC's proposal. Likewise, the comments of some of the intervenors have been helpful in pointing out aspects of the Plan which need to be changed before it is finally adopted. The Commission has considered and weighed heavily all of the comments and testimony. As the Plan operates, this Commission will continue to consider all the comments and may again call upon interested parties to submit their observations and to offer recommendations for improvements.
For purposes of the rest of this Order, the Company's filing in response to our Show Cause Order should be used as a point of beginning and will be used to as such. Hereafter, whenever this Order mentions the "Plan", that will be reference to the rate which this Commission intends to adopt and requires the Company to file incorporating all of the changes required by this Order. We, therefore, find that the following changes must be made to the Company's response before the Plan is adopted:

GENERAL PROVISIONS

QUARTERLY ADJUSTMENTS
General Motors agreed with this Commission that performance evaluations should be a part of rate making but suggested that the evaluations be done only at the times when the utility requested traditional rate relief. While we think some performance evaluation may be appropriate when a utility makes a traditional rate request, we do not believe that the method proposed by General Motors affords the Commission an adequate opportunity to judge the Company's performance and to require adequate performance on a continuing basis. We believe that the quarterly evaluation and adjustment will allow this Commission proper oversight and make the utility more responsive to its customers while, at the same time, yielding a fair return to the Company at the lowest possible rates.

AUDITS
Mr. Thomas H. Weiss testified on behalf of the Attorney General about the need for an initial audit of the Company's historic records as well as the need for a continuing audit during the operation of the Plan. The type of audits which will be made under the Plan will be that of the historical performance and financial records of the Company similar to the audits which are regularly conducted of the Company by the Federal Energy Regulation Commission (FERC), Arthur Andersen and Company and the Internal Revenue Services. Unlike in traditional ratemaking, there will be no adjustments based upon what the Company projected its future financial condition will be. By using historical data, the task of the auditor is somewhat easier. The auditors must ensure that expenditures are properly allocated to accounts, that those expenditures are reasonable and not imprudent, and that the books and records properly indicate the financial condition and true performance of the Company. This Commission recognizes that any audit function is not a simple task but the Commission, through its own resources, can perform all the audits as they are required. It must be remembered that the Commission has just recently audited the Company's book in connection with the Company's filing in U-4774 and in connection with its regular review of the Company fuel adjustment clause. Thus the Commission is very familiar with the Company's books and finances. If, at any time, however, this Commission determines that further auditing needs to be done, this Commission will not hesitate to order such an audit regardless of whether the Plan is in effect or not.

PUBLIC PARTICIPATION
Certain intervenors expressed their desire to have hearings each quarter during the operation of the Plan. They contend that the law requires quarterly hearings. Such a requirement would impose on the utility and the Commission many more hearings than have been had in all prior rate cases filed by this Company and all *381 those hearings would take place in a span of three years. While it is true that hearings have been a part of the traditional ratemaking procedure, hearings have not been the panacea which some intervenors would suggest. Rate hearings in the past have been costly for the people of the state of Mississippi, who ultimately bear the cost of not only this Commission, but also that of the Attorney General and Legal Services. The traditional process is also expensive to the utility. In fact, this Company estimates it has spent approximately $4,000,000.00 since 1980 on various rate matters before this Commission. The traditional rate process with its hearing has also taken valuable time which this Commission can now use to insure the Company is performing well. The Plan which this Commission adopts establishes formulas by which any revenue changes will be calculated during the term of the Plan. Those formulas incorporate all aspects of utility ratemaking which are just and reasonable. Unless this Commission later determines otherwise, those formulas will not be changed during the term of this Plan and will constitute the "rate." The only function remaining, then, will be the mechanical application of this formulary rate to the performance and financial situation of the Company. That sort of mechanical application does not require regular hearing.
Instead of limiting ratepayer involvement, we find that this Plan will give the public more opportunity for input than they have ever had in the past, since the ratepaying public will have direct input to the performance evaluations. This Commission, as a representative of those ratepayers, will also have a much greater opportunity than ever before to evaluate the day to day activities, performance and accounting practices of the Company. This Commission will use this opportunity to protect the ratepayers to a greater extent than could be possible under traditional ratemaking.
Each quarter the Company will file necessary data with this Commission. That data and the Company's calculations will be audited to ensure it is in accord with the rate. The Mississippi public records laws make all information available to the public for inspection and copying, and interested parties need only ask to get all necessary information needed. Under the Plan, this Commission will more closely monitor this Company than it ever has in the past and will not hesitate to alter or modify it if it is found to be necessary.

FILING PROCEDURES
The Company has proposed that, should a dispute arise between the Commission and the Company about a quarterly filing, the revenue change proposed by the Company will go into effect subject to later reconciliation. This procedure is unacceptable. This Commission cannot allow the utility to put into effect any revenue change to which it disagrees. The Plan which is to be adopted shall provide that any revenue change be strictly in accord with the Plan. Any dispute as to any adjustment which may arise between the Company and the Staff shall promptly be brought to the attention of the Commission prior to the effective date of the adjustment. The Company and the Commission will attempt to resolve the dispute prior to the time the claimed adjustment is to go into effect. Should the Commission and the Company be unable to resolve that dispute within that time, only the undisputed portion of the adjustment will be put into effect and the disputed portion shall be resolved by the Commission during the next subsequent quarter. If the dispute is resolved against the Company, the Commission's position will become final. If it is resolved in whole or in part for the Company, that approved portion shall be put into effect at the beginning of the next quarter following the resolution.

ADJUSTMENT CLAUSES
Mr. Weiss has suggested that this Commission synchronize the expense and revenues of the Company's other adjustment clauses with the operation of the Performance Evaluation Plan to insure that there is no double recovery under the Plan. This Commission is knowledgeable of the operation of those other clauses. We regularly audit them and have only recently audited the Company's fuel adjustment clause. *382 This Commission is aware that the method by which the Company accounts for its retail fuel adjustment revenues is synchronized and will not allow the Company to double recover any of the revenues which it collects through that clause. The Company shall synchronize the operation of the other clauses or take other steps to insure that there is no double recovery. During the operation of the Plan, the Commission will insure that there is no double recovery under these clauses.

RATE DESIGN
The Company has proposed that adjustments in revenues generally be allocated on the basis of the base revenues less embedded fuel cost during the historic twelve month evaluation period. This Commission is of the opinion that this method of revenue allocation is presently appropriate. The setting of rates is a matter over which this Commission always has jurisdiction. From time to time, the Commission will review allocations of revenue and whenever adjustments are needed, such adjustments will be made following notice and hearing outside the operation of this Plan.

RATE BASE ADJUSTMENTS
The Company's response generally adopts the treatment of rate base which has been approved and ordered by this Commission in prior rate cases. There are several adjustments to that treatment which must be made to insure that returns achieved under the Plan will be fair and equitable.
The Company has proposed to include all of its construction work in progress (CWIP) in rate base without any allowance for funds used during construction (AFUDC). This Commission has considered for some time the possible inclusion of CWIP in rate base but in the past has done so only in special circumstances. We are well aware of the arguments for and against inclusion of CWIP in rate base but are of the opinion that the time has come for its inclusion. The lessons of the past lead us inevitably to the conclusion that CWIP offers customers lower rates in the long run and gives them the advanced pricing signals which they need to allow them the opportunity to make alternate energy decisions as costs rise. Finally, it avoids the rate shock which occurs when a utility puts a major plant into rate base along with the accumulated AFUDC. We believe that the inclusions of CWIP in rate base is appropriate especially when a utility undertakes construction of major projects generally requiring three or more years for completion. These major projects are the type which cause the rate shock problem.
Accordingly, we direct that the Plan provide for the inclusion of CWIP in the rate base for all projects which are commenced on or after July 1, 1987. All projects which shall reasonably be completed in more than fifteen (15) days but in less than three years shall accumulate an AFUDC offset. Those projects which shall reasonably be completed in three or more years, major plant additions, shall have no AFUDC off-set.
The Company has proposed to include a rate base item for cash working capital but did not, in its responses to the Staff's data request, give an amount for that element. The appropriate method to accurately determine cash working capital is a lead-lag study. The value of cash working capital, as used in this Plan, shall remain zero until the Company has completed and the Commission by order has approved the use of the results of a lead-lag study prepared in accord with an approved methodology.

OPERATING EXPENSES
The Company requests this Commission allow it to charge one-half of all its charitable contributions to retail ratepayers. The Public Utility Act of 1983 allows a reasonable amount of charitable contributions to be included as an operating expense. The Commission finds that it is appropriate to allow some charitable contributions but is of the opinion that only fifty percent (50%) of the Company's contributions, which qualify under Section 170 of the Internal Revenue Code, shall be charged to retail operating expenses.
Mr. Weiss testified on behalf of the Attorney General that excess deferred income *383 taxes should be flowed back to the ratepayers. That is, of course, proper and for that reason this Commission ordered this Company to do just that in the Company's last rate case.
The Company did not mention how they intended to account for the expenses associated with this rate proceeding. That expense is the type which should be amortized over a reasonable period of time and not expensed in the year incurred. We, therefore, order the Company to amortize its expenses associated with this matter over a 36 month period beginning with the effective date of the Plan.

OPERATING INCOME
The Company has proposed to credit its customers with only 50% out of the revenue which it derives from the sale of new non-firm capacity to non-jurisdictional customers. The reason given for the proposed treatment is to offer the Company a reward for making such sales, which the Company asserts will be more difficult to make in the future and will require an aggressive marketing program on their part. The Company also asserts that those sales will not endanger service to jurisdictional customers, since the capacity sold may be recalled at any time and is thus always available to serve jurisdictional customers. This Commission agrees that it is to the advantage of all MPC customers for the Company to make this type of sale and that the Company should be encouraged to do so. The Commission does not feel, however, that such a large portion of the revenue derived from those sales should be credited to the Company. The Commission is of the opinion that it is appropriate for 75% of the retail portion of the revenues derived from new non-firm capacity sales to be credited to operating revenues.

CAPITALIZATION RATIO
This Commission has reviewed the Company's proposal and the intervenors' testimony regarding the proposed use of a hypothetical capital structure, and is of the opinion that it is proper to use the Company's actual common equity ratio.
The Commission notes that the Company has recently refinanced some of its existing bonds. The new, lower interest rates bonds have been issued; but, due to the time required, the old bonds have not been recalled. A June 30, 1986, evaluation would therefore show a capital structure with more debt than should be used and might cause the Plan to falsely operate. For this reason, the Company shall now, and hereafter if the situation again occurs, calculate its common equity ratio under this Plan as though the old bond had been recalled prior to the evaluation period.

BENCHMARK RETURN ON EQUITY (BROE)
In any rate making process, regardless of whether the traditional approach is used or a Plan such as this, there must be a determination of an allowed return on equity from which revenue requirements can be calculated and rates adjusted. Bluefield and Hope require that this return be a fair return to the utility at the lowest reasonable rates to the customer. This Commission normally selects a single value of the allowed return, but there is always a range of reasonable returns which varies with the utility and the economy. The range should also vary with the Company's performance.
Under this Plan, a method must be developed to determine each quarter the Company's allowed rate of return on equity so that any revenue change, either up or down, can be calculated. This will be accomplished by the use of a formula which will determine a Benchmark Return on Equity (BROE) and a fixed matrix which will consider the Company's performance rating. Using BROE and the fixed matrix, an allowed range of returns will be determined each quarter. If the Company's actual return for the evaluation period falls within that range, no change in revenues will be made. If on the other hand the actual return falls outside that range, a change will be made accordingly.
Testimony was offered by the witnesses for intervenors about the method the Company proposed to calculate BROE. With the exception of the testimony of Roger D. *384 Colton, witness for Legal Services, that testimony primarily criticized the amount of flotation costs proposed to be included. Flotation costs are those costs incurred by a company in connection with the issuance of common stock, including the reduction in stock prices which invariably occurs when new stock is issued. These are real costs and since the stock has infinite life, the only reasonable way for the utility to recover the costs is to appropriately adjust the company's allowed return. At the hearing there was considerable testimony as to the amount of such an adjustment. We have considered all the evidence and find that BROE should include 0.25% for the recovery of reasonable flotation costs.
At the hearing, Legal Services offered the testimony of Roger D. Colton, a lawyer from Boston. The Company objected to his testimony as it related to BROE or the calculation of utility rates of return on the grounds that he was not qualified to give such testimony. In response to questioning by this Commission, Mr. Colton admitted that he had no formal training or experience in the field of utility rates of return and that he had never had his testimony on the subject accepted by any other Commission, either state or federal. His only qualification was that he had assisted with the preparation of such testimony and had taught a utility course in which he discussed rate of return. Allowed rate of return is one, if not the most important issue in utility regulations. To a very great extent, it determines what the ratepayer pays and what the Company earns. This Commission will not rely on any expert opinion on such an important issue unless the person giving that opinion can demonstrate that he has the education and experience necessary to form a valued opinion on the subject. We recognize that while Mr. Colton may technically be qualified to offer such expert testimony, his lack of education and experience to give rate of return testimony makes his opinions of little value to us.
The Staff expressed concern that the formula proposed by the Company might change greatly from quarter to quarter. The Company's own witness on the subject, Dr. Roger A. Morin, who has extensive and impressive experience in utility rate of return issues, testified that it was dangerous to rely on one method as a basis for determining the Company's allowed return. In his testimony, Dr. Morin reviewed ten methods which might be used to calculate a reasonable rate of return but recommended only one for the calculation of BROE due to administrative expediency.
This Commission finds that the quarterly DCF formula used to calculate BROE is the appropriate method. We are, however, concerned about the manner by which the value of growth factor as used in the formula is determined. None of the witnesses disagree with the use of analyst's growth forecast as proposed by the Company as a source of the growth factor. We agree, however, with Dr. Morin that it is dangerous to rely on one technique and find that BROE may change substantially from quarter to quarter if only that one technique is used.
This Commission finds that a fair and reasonable method of calculating BROE within the context of this Plan is to calculate BROE by computing a simple average of the results of three quarterly DCF methods contained in Dr. Morin's testimony. The three methods are:
1. Comparable-rated electric utilities with analysts growth forecasts  which is the method Dr. Morin recommended;
2. Comparable-rated electric utilities with 5 year historical dividend growth determined from the Value Line; and
3. Comparable-rated electric utilities using a sustainable growth method the parameters of which likewise are obtained from the Value Line.

All three of these methods utilize the same D.C.F. formula and data except for the value of the growth factor. By averaging the three methods, changes will be moderated, confidence in the results will be enhanced and the allowed rate of return to the Company under the Plan will be fair and reasonable.
Exhibit B is to be revised and corrected to reflect the methods described above and in Dr. Morin's testimony.
*385 This Commission will monitor BROE, along with all other aspects of this Plan, and if, at any time, changes in BROE are found to be too volatile or not yielding reasonable returns, this Commission will immediately take such steps as is necessary.

PERFORMANCE INDICATORS
The performance indicators and the performance evaluation aspect of this Plan make it unique to any other ratemaking method which has been adopted in this country. The purpose of the performance indicators is to measure how well the Company is performing its overall utility function against reasonable standards and then to use those performance evaluations in setting the returns which the utility is allowed to earn.
This approach differs from what may be called "incentive" ratemaking in that it grades the Company in much the same way a student is graded. Under this performance approach, the Company is encouraged by rewards to perform well and discouraged by penalties for poor performance. With the "incentive" approach, there is reward for improvement but no disincentive for remaining the same or declining. We find that the performance based plan is reasonable and appropriate.
There seems to be general agreement by all parties that the performance indicators proposed by the Company covered most of the important areas of an electric utility's operating. There are, however, adjustments which need to be made in these performance indicators so that they will truly achieve their objective. We stress again that this performance evaluation is new and innovative and therefore this Commission has nothing with which to compare it. While this Plan as modified represents the best efforts of this Commission, we will review its operation on a quarterly basis and will not hesitate to take remedial action when and if any inequities arise or should the Plan not operate to fulfill the objectives for which it was adopted. We recognize that any changes in the Plan will require notice and hearing but see no reason why adjustments cannot be made or the Plan discarded between evaluation periods.
In order to properly evaluate the Company, scales must be set for each performance indicator which establish reasonable standards. If a scale is too low, the Company will always score well. On the other hand, if the scale is set too high, the Company will be encouraged to spend more money than is prudent in order to score well.
The Commission has reviewed the scales proposed by the utility and the independent work done by the Staff and finds that the following changes should be made to the performance indicator scales:
The scale proposed by the Company for the Equivalent Availability indicator is entirely too low. It does not appear to be based on any reasonable standard or any acceptable scaling method. The scale should be a normal curve based on the available industry data. Based on these considerations, the following scale shall be used:

 SCORE PERCENT
 0 BELOW  68.69
 1 68.70  72.09
 2 72.10  74.99
 3 75.00  76.59
 4 76.60  78.99
 5 79.00  81.69
 6 81.70  83.09
 7 83.10  85.39
 8 85.40  86.79
 9 86.80  89.59
 10 89.60  ABOVE

The scales proposed by the Company for Safety has the same deficiencies as Equivalent Availability and is also too volatile. If the Company's scale is used, MPC will apparently always score either a ten or a zero. Based on industry data for normal curve the following scale shall be used:

 SCORE SAFETY PERFORMANCE
 0 125  ABOVE
 1 94.0  124.9
 2 59.0  93.9
 3 42.0  58.9
 4 32.0  41.9
 5 20.0  31.9
 6 15.0  19.9
 7 10.0  14.9
 8 9.0  9.9
 9 7.0  8.9
 10 6.9  UNDER

*386 This scale will eliminate the volatility but will still cause the Company to score zero if it has a fatal accident, which we believe it should. On the other hand, the Company will score well if it is doing a proper job with safety.
The Company's Contribution to Load Factor indicator needs major modification to correct it. First, however, this Commission finds that such an indictor is appropriate. By increasing load factor, the Company can reduce the costs to existing customers and delay the addition of plant needed to serve new load. Thus, the Company should be judged on how well it increases its load factor. Unfortunately changes in load factor are easily affected by the weather, economy, and other such factors over which the Company has no control. For this reason, this indicator does not measure actual load factor but instead measures how much this Company's load factor increases as a result of its marketing of the end uses of electrical processes and equipment assuming all other conditions remain the same.
The indicator as proposed give the Company complete control over its score without insuring the long-term benefits which the indicator is intended to promote. The Company's response gives credit for loads added on its off-peak rider and interruptible rate and for direct load control sales. The reason given by the Company for including these loads was that they helped delay new generating plant additions and were therefore of long-term benefit to customers. If the Company could assure that the customers on these rates would remain on them for a sufficient period of time, plant additions could be delayed and long-term benefits could be derived. The Company's rates do not require this, however; and at the present it is not in the overall benefit of MPC or its customers to encourage the use of these rates. Accordingly the plan shall eliminate any credit under this indicator for these types of loads. The plan should also not allow any credit for street lighting. Considering the changes, the scale must be adjusted to the following:

 SCALE PERCENT
 0 .079  BELOW
 1 .080  .089
 2 .090  .099
 3 .100  .109
 4 .110  .119
 5 .120  .129
 6 .130  .139
 7 .140  .149
 8 .150  .159
 9 .160  .169
 10 .170  ABOVE

The Company is implementing a system to more accurately measure its service reliability. That system is to be operational by the summer of 1986, which means that a full year's data will not be available until the summer of 1987. While the Company is developing this system and gathering its initial information, it proposes to score itself at a seven (7) on the indicator. This will give the Company a better than average score even though it has been unable to justify that performance. This Commission is of the opinion that the Company should start with a neutral score of five (5) and that as actual data is obtained on service reliability it should be phased into the score on a quarter by quarter basis. We find that this is fair to the Company and the ratepayers.

ADJUSTMENTS FOR FIRM CAPACITY SALES
In prior proceedings, this Commission has required MPC to credit all revenues derived from firm capacity sales to operating revenues. The effect of this has been to reduce the amount of revenues that are required from retail customers and thereby to reduce rates. This has been a substantial benefit to MPC's customers in the past. If MPC makes other such sales in the future, those sales will likewise benefit retail customers. In order that customers derive the maximum benefit from these future sales and the Company be fairly compensated for past sales, adjustments in revenues will be made whenever there is a change in the amount of revenues to be derived by the Company from such sales, either increase or decrease. The effective date of such revenue changes shall be the date of the change as determined from the *387 contracts under which such sales are made. The amount of such adjustment shall be the retail portion of the amount of the actual change or two percent (2%) of the Company's annual aggregate revenues for the twelve (12) month period following the effective date of the change, whichever is lesser.
MPC has stated that the first such change will occur on January 1, 1987, and will require an adjustment to retail revenues in the amount of $7,141,000.00. The next change of any significance will occur on January 1, 1989, and will be in the approximate amount of $3,399,000.00 depending upon the then current retail allocation. Provided these changes actually occur and do not exceed the two percent (2%) cap, adjustments in retail revenues will be made in those actual amounts on those dates. Any other changes, either increases or decreases, will be made as they occur; provided, however, that any change allocated to the retail jurisdiction in an amount less than $1,000,000.00 will be treated through the Plan's quarterly evaluation and not by a separate adjustment under this Firm Capacity Sales provision. The Commission will audit each of the adjustments to be made under this provision and shall insure that customers get full credit for future sales and that the Company does not recover any revenue through the Plan's quarterly evaluations which has been previously recovered under this provision.

EFFECTIVE DATE
The Plan shall be effective for the evaluation period ending March 31, 1986, for which information was submitted by the Company, available to and reviewed by all intervenors and the staff and audited. If a change had been required for that evaluation period, it would have been effective with the Company's first billing cycle in July, but the Commission's evaluation of the Company's performance and financial condition for that March 31, 1986, evaluation period shows that no revenue adjustment is due. The Company shall, however, formally file its information on the March 31, 1986, evaluation in accord with the Plan as modified by this Order so that this Commission can confirm its determination for that evaluation period.
The Commission also notes that the time for the filing of the Company's June 30, 1986, evaluation information under the Plan will be August 7, 1986. Since the Company will receive notice of this Order only shortly before that date, the Company shall file its June, 1986, evaluation information on or before August 18, 1986, unless good cause is shown by it as to why it should be granted additional time.
WHEREFORE, PREMISES CONSIDERED Mississippi Power Company is hereby ordered to modify its proposal in accord with this order and to submit it promptly to this Commission for approval.
SO ORDERED this the 7th day of August, 1986.
Chairman Nielsen Cochran votes Yes; Commissioner Lynn Havens votes Yes; Commissioner D.W. Snyder votes No.
 MISSISSIPPI PUBLIC SERVICE
 COMMISSION
 /S/ Nielsen Cochran
 Nielsen Cochran, Chairman
 /S/ Lynn Havens
 Lynn Havens, Vice Chairman
 /S/ D.W. Snyder
 D.W. Snyder, Commissioner
NOTES
[1] We are not unmindful of the fact that as of the time of this appeal the Commission had challenged one quarterly adjustment. However, the resulting rate increase was subsequently accepted by the Commission without any significant changes. Furthermore, we are totally ignorant of any factual basis for the Commission's challenge to that adjustment for the simple reason that the Commission did not offer any rationale.
[1] See Miss. Code Ann. § 77-3-42 (Supp. 1988).