# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-UR-01108-SCT

*MISSISSIPPI POWER COMPANY, INC.*

*v.*

*MISSISSIPPI PUBLIC SERVICE COMMISSION*
*AND THOMAS A. BLANTON*


| | |
|---|---|
| DATE OF JUDGMENT: | 06/22/2012 |
| TRIAL COURT ATTORNEYS: | BEN HARRY STONE |
| | RICKY J. COX |
| | MICHAEL ADELMAN |
| | CHRISTA R. BISHOP |
| | C. STEPHEN STACK |
| | SHAWN S. SHURDEN |
| COURT FROM WHICH APPEALED: | MISSISSIPPI PUBLIC SERVICE COMMISSION |
| ATTORNEYS FOR APPELLANT: | BEN HARRY STONE |
| | TIMOTHY ALAN FORD |
| | RONALD WADE ROBERTSON, JR. |
| | RICKY J. COX |
| | LEO ERNEST MANUEL |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL BY: JUSTIN L. MATHENY |
| | SHAWN STEPHEN SHURDEN |
| | MICHAEL ADELMAN |
| NATURE OF THE CASE: | CIVIL - UTILITY RATE |
| DISPOSITION: | REVERSED AND REMANDED - 02/12/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2013-UR-00477-SCT


*THOMAS A. BLANTON*

*v.*

**MISSISSIPPI POWER COMPANY, INC. AND
MISSISSIPPI PUBLIC SERVICE COMMISSION**

DATE OF JUDGMENT:                    03/05/2013
COURT FROM WHICH APPEALED:    MISSISSIPPI PUBLIC SERVICE
                                                    COMMISSION
ATTORNEY FOR APPELLANT:          MICHAEL ADELMAN
ATTORNEYS FOR APPELLEES:         BEN HARRY STONE
                                                    RICKY J. COX
                                                    LEO ERNEST MANUEL
                                                    RONALD WADE ROBERTSON
                                                    TIMOTHY ALAN FORD
                                                    OFFICE OF THE ATTORNEY GENERAL
                                                    BY: JUSTIN L. MATHENY
                                                    SHAWN STEPHEN SHURDEN
NATURE OF THE CASE:                  UTILITY RATE
DISPOSITION:                              REVERSED AND REMANDED - 02/12/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Thomas Blanton asks this Court to invalidate rate increases approved by the Public

Service Commission ("Commission") for Mississippi Power Company ("MPC"). An

examination of controlling law and statutes, the Constitutions of the United States and

Mississippi, and a comprehensive review of the proceedings before us reveals that the

Commission failed to comply with the language of the Base Load Act,[1] *inter alia*, and

exceeded its authority granted by the Act. The increased rates were achieved by including

"mirror CWIP" in the rate base and rates. Following the inclusion of "mirror CWIP," the

---

[1]    Miss. Code Ann. §§ 77-3-101 to 77-3-109 (Rev. 2009).

Commission "approve[d] the retail revenue adjustment over 2013 and 2014 . . . allow[ing] the Company an annual rate designed to collect $125,000,000 for 2013, escalating to $156,000,000 in 2014. This represents a 15% and 3% increase, respectively." Commission's Final Order, p. 24 (Mar. 5, 2013).[2] The increased rates on 186,000 South Mississippi ratepayers fail to comport with the Act or, otherwise, with our law. Accordingly, the order granting rate increases is reversed, and this matter is remanded to the Commission for proceedings consistent with this opinion.

## I. BACKGROUND

¶2.    In *State ex rel. Pittman v. Mississippi Public Service Commission*, 520 So. 2d 1355 (Miss. 1987), this Court declared no authority existed for the Commission to "grant a rate increase for power never delivered." *Pittman*, 520 So. 2d at 1363. Twenty-one years later, the Legislature passed the Base Load Act as an alternative method of cost recovery for base load generation, "eff[ective] from and after passage (approved May 9, 2008)." *See* Miss. Code Ann. §§ 77-3-101 to 77-3-109. Section 77-3-105(1)(a) reads:

> The commission is fully empowered and authorized to include in an electric public utility's rate base and rates, as used and useful components of furnishing electric service, all expenditures *determined to be prudently-incurred* pre-construction, construction, operating and related costs that the utility incurs in connection with a generating facility (including but not limited to all such costs contained in the utility's "Construction Work in Progress" or "CWIP" accounts), whether or not the construction of any

---

[2] "The Commission notes that the annual revenue adjustment will not be collected in full; that is, an annual rate designed to collect $125 million will actual collect $99 million from April – December 2013. The Commission also points out that the Commission, this day, has approved a rate reduction of approximately 2.7% relating to MPC's non-Kemper business, which will reduce the impact to ratepayers related to the CWIP collection." Commission's Final Order, p. 24 (Mar. 5, 2013).

generating facility is ever commenced or completed, or the generating facility is placed into commercial operation. However, all costs incurred before May 9, 2008 may be reflected in rates only upon an order of the Public Service Commission after a finding of prudency.

Miss. Code Ann. § 77-3-105(1)(a) (Rev. 2009) (emphasis added). Section 77-3-105(b) reads:

The commission is further empowered and authorized to allow a public utility to accrue a just and reasonable rate of return to be determined by the commission on the unrecovered balance of any pre-construction or construction costs which shall include all costs incurred before May 9, 2008 and *such costs may be reflected in rates only upon an order of the Public Service Commission after a finding of prudency*.

Miss. Code Ann. § 77-3-105(1)(b) (emphasis added). The Act permits recovery of prudently incurred "preconstruction" costs, even if construction never "commence[s]"; permits recovery of prudently incurred "construction" costs, even if the plant is never "completed"; and permits recovery of prudently incurred "operating and related costs," even if the facility is never "placed into commercial operation." The Act further permits a "just and reasonable rate of return," only upon a determination of prudency. Whether it be costs incurred or a rate of return, the Commission is required to make a determination of prudency.

¶3. Following its enactment, MPC, whose assets then totaled approximately $2 billion ($2,000,0000,000), petitioned the Commission to approve the Kemper Project, projecting a net cost of $2.2 billion ($2,200,000,000) and a completion date of May 2014. In its most recent "Monthly Status Report" to the Commission in Docket No. 2009-UA-0014, dated February 3, 2015, MPC now projects the costs at more than $6.172 billion ($6,172,200,000), a 281% increase from the original net cost. There has been an increase of $68 million ($68,000,000) since MPC's monthly status report filed on October 2, 2014 – a $25 million ($25,000,000) increase reported on January 2, 2015, and a $43 million ($43,000,000)

4

increase reported on February 3, 2015.[3] The original certification for $2.88 billion ($2,880,0000,000) is less than one half of the now-projected costs. Construction of the project continues under a temporary certificate.

¶4. MPC requested approval of its Certified New Plant, Rate Schedule CNP-A, a rate mechanism designed to provide recovery of the construction financing costs during the construction period.[4] The Commission denied MPC's CNP-A rate schedule, and MPC appealed the denial to this Court, arguing that the Commission acted arbitrarily and capriciously when it denied MPC CWIP recovery. Blanton intervened in the appeal and also filed a separate appeal. By agreement, MPC and the Commission dismissed MPC's appeal. However, Blanton's appeal is properly before this Court.

## II. ISSUES

¶5. Blanton's arguments, *inter alia*, are stated verbatim as follows:

1. Do CWIP assessments under the Mississippi "Base Load Act" (Section 77-3-101, *et seq.*, of the Mississippi Code of 1972, as amended) constitute an unauthorized illegal tax?

2. Is Section 77-3-101, *et seq.* (The Base Load Act) in violation of the Mississippi Constitution and the Constitution of the United States?

3. Do CWIP assessments under the Mississippi "Base Load Act" constitute substantive confiscatory takings in violation of the Due Process Clause of the Fourteenth Amendment to the United States

---

[3] To put the expanse of the project in context, the projected cost is greater than the entire budget for the State of Mississippi for both the 2014 fiscal year ($5,772,010,253) and the 2015 fiscal year ($6,073,368,771). As of the date of this opinion, the portion of the plant which uses integrated gasification combined cycle (IGCC) is not online.

[4] As referenced in MPC's briefs, MPC was seeking to recover financing costs "as they are incurred instead of compounding those costs until the plant is complete."

Constitution and/or the Due Process Clause of the Mississippi Constitution (Art. 3, § 14)?

4. Whether the "Settlement Agreement" is an invalid instrument and should be vacated.

## III. STANDARD OF REVIEW

¶6. "When reviewing the constitutionality of a legislative enactment, there is a strong presumption of validity. . . ." *City of Starkville v. 4-Cnty. Elec. Power Ass'n*, 909 So. 2d 1094, 1112 (Miss. 2005) (citing *Richmond v. City of Corinth*, 816 So. 2d 373, 375 (Miss. 2002)). However, it is well-settled that "a constitutional question will be passed on where the issues involved in a particular case are such that the case may be decided on other grounds." *Warner-Lambert Co. v. Potts*, 909 So. 2d 1092, 1093 (Miss. 2005) (citing *Broadhead v. Monaghan*, 238 Miss. 239, 255, 117 So. 2d 881, 888 (1960)).[5]

¶7. Pursuant to Section 77-3-72 of the Mississippi Code, the Commission's Order

> shall not be vacated or set aside either in whole or in part, except for errors of law, unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights.

Miss. Code Ann. § 77-3-72(4) (Rev. 2009).

> While broad authority and discretion has been promulgated in favor of the Commission that power is not unbridled and the rules and regulations which it has promulgated to aid in the fulfillment of its duties under the chapter must not be utilized in an arbitrary or capricious manner, "It is clear under Mississippi law that an administrative agency cannot exceed the scope of authority which was granted to it by the legislature. (citations omitted)." *Mississippi Board of Nursing v. Belk*, 481 So. 2d 826, 829 (Miss. 1985).

---

[5] Blanton also argued that CWIP is a pledge in violation of Article 14, Section 258 of the Mississippi Constitution, which we decline to address.

Further, the Commission's authority to interpret the statutes under which it operates may not supersede the requirements thereof, nor may it conflict with pertinent rules of law. *Capital Electric Power Association v. Mississippi Power & Light Co.*, 240 Miss. 139, 153, 125 So. 2d 739, 744 (1961).

*Pittman*, 520 So. 2d at 1357-58.

## VI. ANALYSIS

### *A. Tax*

¶8.     Blanton first asks this Court to declare CWIP assessment an illegal tax. The "essential feature of any tax [is that] it produces at least some revenue for the Government[,]" and that revenue is intended "for the use and benefit of that government." *Nat'l Fed'n of Indep. Businesses v. Sebelius*, __ U.S. __, 132 S. Ct. 2566, 2594, 183 L. Ed. 2d 450 (2012); *Austin v. Centerpoint Energy Arkla*, 226 S.W.3d 814, 820 (Ark. 2006). A tax is paid to the government, not a "privately-owned corporate entit[y]" which is "not [an] arm[] of the State." *Austin*, 226 S.W.3d at 820. These essential elements are not present in the case *sub judice*.

¶9.     The assessment is not paid to the government – it is paid by the ratepayers to MPC. The exaction imposed is not used for the support of our government. "Mirror CWIP" is not an illegal tax, for it is not a tax at all.

### *B. Commission's Application of the Statute*

¶10.     Assuming the presumptive validity of the Act, *see City of Starkville*, 909 So. 2d at 1112, and following our precedent to pass on constitutional challenges when cases may be decided on other grounds, *see Warner-Lambert*, 909 So. 2d at 1093, we choose the narrower path to resolve the issues presented today. Thus, we examine whether the Commission

7

applied the Act in a statutorily permissible manner. If the Commission's putative application of the Act follows the directives and its application comports with due-process principles, Blanton's arguments are doomed to fail.

¶11.    While the Court gives great deference to state agencies, "[t]he ultimate authority and responsibility to interpret the law, including statutes, rests with this Court." ***Queen City Nursing Ctr., Inc. v. Miss. State Dep't of Health***, 80 So. 3d 73, 84 (Miss. 2011). The Legislature had authority to enact a law; however, the Commission does not have the right to amend or modify such act. No legitimate argument can overcome the legal principle that the Commission is bound to comply with legislative acts. *See **Pittman***, 520 So. 2d at 1357-58. *See also **Howell v. State***, 300 So. 2d 774, 779 (Miss. 1974) ("an administrative agency cannot be vested with arbitrary and uncontrolled discretion.").

¶12.    The Act permits the Commission to include CWIP only if the costs are determined to be "prudently incurred." *See* Miss. Code Ann. § 77-3-105 (Rev. 2009).[6] MPC and the Commission argue that the Act was followed when the Commission authorized MPC to increase rates by fifteen percent for 2013 and three percent for 2014. Yet the record is devoid of a "finding of prudency" or that MPC's expenditures were "prudently incurred," and for good reason – no prudency hearings have been held. In the absence of prudency hearings,

---

[6] In its May 26, 2010, Order, the Commission specifically authorized "one hundred percent (100%) of all construction costs (*subject to prudence reviews* as provided herein)" to be recovered for 2012, 2013, and 2014. Commission's Order, p. 17 (May 26, 2010) (emphasis added). Additionally, on April 24, 2012, the Commission issued its Final Order on Remand Granting a Certificate of Public Convenience and Necessity, Authorizing Application of Baseload Act, and *Approving Prudent Pre-Construction Costs*. (Emphasis added.)

we fail to discern how a rate can be arbitrarily declared as "fair, just, and reasonable" and/or "just and reasonable." *See* Miss. Code Ann. §§ 77-3-33 and 77-3-105(b) (Rev. 2009).

¶13.    Paragraph 22 of MPC's original petition for certification reads: ". . . the Company is proposing and requesting . . . a prudence review process for *already incurred and to-be-incurred* preconstruction and construction costs [and] a rate mechanism. . . . [A]pproval of each and every one of these measures is necessary." By stipulation, the Commission improperly deferred prudency hearings, which are a prerequisite to granting an increase in rates. *See* Miss. Code Ann. §§ 77-3-105(1)(a) and (1)(b).[7] By not conducting prudency hearings, the Commission ignored the dictates of the Act and thus acted arbitrarily without lawful authority.

¶14.    One component of the Act is to allow utility companies to collect *prudently incurred* preconstruction costs, construction costs, and finance costs as incurred to reduce the finance costs, which are capitalized in the utility's allowance for funds used during construction ("AFUDC") upon commercial operation. "AFUDC represents interest on borrowed funds, dividends on preferred stock, and the imputed return on common stock." **Miss. Pub. Serv. Comm'n v. Miss. Power Co.**, 429 So. 2d 883, 897 n.7 (Miss. 1983). The Act contemplates

---

[7] By stipulation, MPC "agreed to defer a prudence review until a later date. Consistent with the stipulation, this Commission hereby declines to address the prudence of the Kemper Project costs in this proceeding, but this decision shall not *disclose* MPC from requesting a prudence review at a later time or this Commission conducting prudence reviews, *sue sponte*." Commission's Final Order, p. 25 (Mar. 5, 2013) (emphasis added and in original). Certainly, the Commission intended to state that the decision would not "foreclose" MPC from requesting reviews, not that such prudence hearings would not be disclosed. The Commission further ordered that "nothing contained in this Order shall be construed as a finding of prudence of any of the Kemper Project costs, which shall be subject to a separate prudence review as subsequently determined by this Commission." *Id*. at 26.

increasing rates to pay AFUDC as incurred, which, if done, would mitigate the effect of compounding interest.[8] However, this appeal concerns "mirror CWIP,"[9] resulting in MPC charging increased rates. But the ratepayers' property (money) is placed into a regulatory liability account controlled by the Commission. Thus, the money exacted is not being used to pay for funds used during construction as expenses are incurred. The ratepayers' property (money) is being confiscated[10] through governmental decree, by a rate increase imposed by a privately owned corporation that cannot spend it. There is no authorization to impose "mirror CWIP" in the statute.

¶15. The Commission has exhibited a pattern of conduct throughout these proceedings that exceeds its authority. The Commission's tasks remain undone and its duties unfulfilled. The Commission does not have unbridled authority to adopt recovery mechanisms which are not authorized by existing law. While the Act permits the Commission to include CWIP in the utility's rate base and rates, the Act did not authorize the Commission to adopt an entirely new mechanism, i.e., "mirror CWIP"(a concept not previously recognized in Mississippi rate-making practices). An affirmance of the Commission's order can only perpetuate these transgressions.

---

[8] MPC maintained in its original brief that it was seeking to recover costs during construction to avoid compounding those costs upon completion of the plant.

[9] "Mirror CWIP" provides that the "funds collected during the construction period . . . be recorded to a regulatory liability account and held for the sole benefit of customers for the purpose of partially or fully offsetting future rate increases that would otherwise occur after commercial operation." Commission's Final Order, p. 10 (Mar. 5, 2013).

[10] Confiscatory taking is discussed further in Section IV(C)(1).

¶16.    Absent compliance with the Act, no legal authority existed to increase the rates. *See* Miss. Code Ann. § 77-3-105(1)(a) (Rev. 2009). Ratepayers should not be bound by decisions made by the Commission which do not comport with the laws of our State. This Court will not condone the forced payments for rate increases not authorized by the Act or existing law. On remand, the Commission is hereby instructed to (1) fix by order the rates in existence prior to its order of March 5, 2013; (2) fix no rate increases until the Commission is in compliance with this Court's opinion; and (3) enter an order refunding the monies attributable to the rate increases allowed by the March 5, 2013, Order. The Commission is further instructed to meet its obligations as set forth in the Act regarding all future proceedings. The decision of this Court does not foreclose MPC from seeking recovery of its financing costs through a rate increase, as long as the laws of our state are adhered to by the Commission. At the same time, as the Commission states in its briefs, the Act does not provide MPC an "entitlement" to CWIP recovery. If MPC never recovers CWIP, it still may seek to recover construction financing costs included in MPC's AFUDC accounts, as traditionally has been done.

### C. Due Process

¶17.    Blanton argues that the assessments (increased rates) ordered by the Commission constitute confiscatory takings which violate his and others' due-process rights. Blanton argues that the Commission's actions violate the Due Process Clause of the United States and

11

Mississippi Constitutions.[11] In a specially concurring opinion, Justice Hawkins once eloquently penned:

> Due process has been addressed by courts in so many different ways and defined in so many situations, it would take a lifetime just to read the cases. There is nothing mysterious about the term, however. To most of us its central meaning simply is even handed fairness in legal proceedings.
>
> . . .
>
> Not only every lawyer, but most citizens are aware that no court can, under our Constitutions, take away property or valuable rights from any person without giving him fair notice and an opportunity to be heard.

*Mississippi Power Co. v. Goudy*, 459 So. 2d 257, 270-71 (Miss. 1984) (Hawkins, J., specially concurring).

### 1. Commission's Noncompliance with the Act

¶18.    While this Court understands that the ratepayers have no property interest in a *certain rate*, the ratepayers may not be "subject to proceedings in which he or she may be deprived of a protected property interest without adequate protection in place to certify the fundamental fairness of the action taken by the government (in this case, the Public Service Commission)." *See* Brief of Appellee/Cross-Appellant, at p. 26.  In *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978), the Supreme Court held that:

> [a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the

---

[11] The Constitution of the State of Mississippi states "[n]o person shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, § 14. The Fifth Amendment to the United States Constitution states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ." U.S. Const. amend. V.

circumstances, to *apprise interested parties* of the pendency of the action and afford them an opportunity to present their objections.

*Craft*, 436 U.S. at 13, 98 S. Ct. at 1562 (emphasis added) (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)). *See also City of Tupelo v. Miss. Emp't Sec. Comm'n*, 748 So. 2d 151, 153 (Miss. 1999).

¶19. Blanton argues that "mirror CWIP" facilitates a confiscatory taking of property, violating his and all ratepayers' substantive due-process rights. By approving increased rates based on "mirror CWIP" recovery, the Commission has deprived the ratepayers of their property, i.e., money.[12] As previously stated, the increased rates are not being used to pay for funds during construction as provided by the Act. There is no question that the taking of private funds is a transfer of the property and results in the deprivation of that property.

¶20. *Ab initio*, the Commission deprived ratepayers of procedural due process by failing to require notice to the ratepayers.[13] No notice of the original filing was provided to the ratepayers in the overwhelming majority of the southeastern Mississippi counties constituting

---

[12] Even though the Commission's Order provides for a return of the ratepayers' money if the plant does not go into operation, it is no less a deprivation of property. It is well-settled that "a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes v. Shevin*, 407 U.S. 67, 84-85, 92 S. Ct. 1983, 1996, 32 L. Ed. 2d 556 (1972) (citing *Bell v. Burson*, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969)).

[13] Section 77-3-13, related to certificates of need, reads in pertinent part that, "the Commission shall set the matter for hearing and shall give reasonable notice of the hearing thereon to all interested persons, as in its judgment may be necessary under its rules and regulations. . . ." Miss. Code Ann. § 77-3-13(3). In regard to changes in rates, Section 77-3-37 reads in pertinent part that "[t]he Commission may promulgate rules and regulations providing for notice to customers of the filing by any public utility for a rate increase. . . ." Miss. Code Ann. § 77-3-37(1).

MPC's service area.[14] MPC sought and obtained approval for CWIP recovery that would result in rate increases. When MPC pursued rate increases as part of its certificate filing, all of its customers were entitled to notice. Few, if any, received it. The ratepayers are "interested parties" in this proceeding. We read these statues, rules, and regulations to require that the Commission, on remand, is to order that notice be provided to all ratepayers regarding all future proceedings related to rate base, rates, rate of return, and prudency hearings.

¶21. Blanton raises his objections, not only for himself, but also for the unnoticed ratepayers. No argument has been advanced that all ratepayers participated in every stage of these proceedings, because it simply is not true. Notice was not properly given. The construction and operation of this multibillion dollar electric generation facility was going to increase rates. Any suggestion to the contrary is facetious and wholly untenable.[15] Ratepayers first received notice of MPC's intent to increase rates after entry of the April 24, 2012, Order, when an increase in rates was a *fait accompli*. "[A]s a practical matter," ratepayers should have been provided notice in the initial proceedings in order to protect their "substantial interest . . . [in the] outcome of the proceeding . . . ." Public Utilities Rules of

---

[14]Notice was published in the *Jackson Clarion-Ledger*, *Kemper County Messenger*, *Meridian Star*, *Clark County Tribune*, and *Jasper County News*. Direct notice was not provided to a single customer in any of the twenty-three counties served.

[15]Unlike some cases where speculation would be required as to the effect various events might have on a utility's rates, here we already know rates were increased eighteen percent in response to MPC's petition to recover only financing costs, a small fraction of the total cost of the project. Once the plant goes into full operation, MPC will attempt to maximize the costs attributed to the project to be capitalized and will seek further rate increases.

Practice and Procedure 6.121. Yet ratepayers were not afforded procedural due process via notice.

¶22.    MPC not only sought rate increases but separately requested that the long-range rate-impact information furnished to the Commission be kept confidential, a direct violation of Section 77-3-37, which requires that information regarding changes in rates be "kept open to public inspection." Miss. Code Ann. § 77-3-37(1) (Rev. 2009). The Commission improperly determined rate-impact information to be confidential, concealing from the ratepayers the amount of the projected increases.   The Commission improperly sealed information to which the public was entitled.[16] The Commission and MPC claim that, since a specific rate increase was not requested in the initial petition, it was proper to seal that information.  That argument must fail, because the public has a right to know when and how much its rates will be increased at all stages of a proceeding. The Commission's decision to govern in a cloak of secrecy and grant confidentiality to rate-impact information was arbitrary and capricious.

*2. Settlement Agreement*

---

[16]In his concurring-in-part and dissenting-in-part opinion, Commissioner Presley criticized the Commission's decision to keep rate-impact filings confidential. He stated:

> The Company's proposal and filings in this case keep confidential and out of the public's view the possible rate impacts associated with the project. Although current Commission rules allow for this practice, the majority should have made public disclosure of the rate impact a condition that must be met by the Company to make the application consistent with the public interest. *MPC ratepayers have a right to know what they will be faced with paying for such an essential service as electricity should the Company go forward with the project.* This is basic information that MPC ratepayers have a right to know.

15

¶23. On January 25, 2013, MPC and the Commission filed a Joint Motion to Dismiss with Prejudice,[17] arguing that the two parties "resolv[ed] all disputed issues" in MPC's direct appeal.[18] MPC and the Commission attached a copy of a Settlement Agreement, which was ironed out in private meetings, to the joint motion. In the Settlement Agreement, the Commission acknowledged that "MPC [was denied] the recovery of CWIP financing costs to date as well as any prudence review of such costs and [MPC] is unable to retroactively recover these costs under law," but agreed to consider a new petition for rate increases based on "mirror CWIP," a concept not previously disclosed in the proceedings. In return, MPC agreed to dismiss its appeal of the "contested proceeding" pending before this Court.[19] Both agreed that each would be allowed to opt out of this agreement if it is determined that "the Commission lacks the legal authority to implement a multi-year rate mitigation plan and/or an alternate financing plan to the extent and in a manner contemplated by this Settlement Agreement" or if any "order related to the Kemper Project previously issued or contemplated under this Settlement Agreement is subsequently reversed by an appellate court during the term of this Settlement Agreement." Additionally, the Commission and MPC stipulated that the Commission would

> make every effort to consider the prudence of all Kemper Project costs incurred as of December 31, 2012 in connection with the 2013 CWIP rate

---

[17] This Court granted MPC's and the Commission's joint motion on February 14, 2013.

[18] MPC and the Commission also filed a joint motion, requesting that Blanton's cross-appeal be dismissed. However, this Court denied this motion and additionally ordered supplemental briefing as to Blanton's claims.

[19] MPC appealed the Commission's earlier denial of an increased rate based on CWIP.

proceeding provided for in subsection (a) above, but in any event shall make a prudence determination concerning these costs within six (6) months of executing this Settlement Agreement. . . .

¶24. The Agreement also provided that the customers (ratepayers), who ultimately bear the majority of the risks of the project, would be credited with ten percent of any royalties derived from the sale of "TRIG™ technology in the commercial electric power generation market," although the Agreement fails to explain the allocation of the remaining ninety percent. The Settlement Agreement was the first public disclosure of that separate agreement.

¶25. No authority exists for the Commission to conduct public business in private. Pursuant to Section 77-2-13(4)(a), the Commission is forbidden from all *ex parte* communication regarding a "contested proceeding." The argument that the case was on appeal is without merit. The private meetings clearly violate the statutes governing the Commission. The public has a right to see and hear its business being conducted. The rate increase resulting from the private agreement to dismiss MPC's appeal and facilitate a refiling resulted in the increases being contested today. Because the Commission lacked authority to enter into a private settlement agreement, the agreement is unenforceable.

## IV. CONCLUSION

¶26. An analysis of these proceedings leads to the inescapable conviction that the Commission failed to fulfill its duties and obligations pursuant to statutory directives and our existing law and that the overwhelming majority of 186,000 ratepayers was not accorded due process from the beginning. As such, the Commission did not balance the ratepayers' interests with those of the utility, as our law requires. **Miss. Pub. Serv. Comm'n v. Miss. Power Co.**, 429 So. 2d 883, 887 (Miss. 1983). An affirmation of the Commission's actions

17

would constitute a grave injustice. U.S. Const. amend. V, XIV; Miss. Const. art. 3, § 14; *Goldberg v. Kelly*, 397 U.S. 254, 267-68, 90 S. Ct. 1101, 25 L. Ed. 2d 287 (1970) (The "fundamental requisite of due process . . . is the opportunity to be heard.") Government's powers must be exercised in satisfaction of due process, including adequate notice and the opportunity to be heard. *See Webb v. Town Creek Master Water Mgmt. Dist.*, 903 So. 2d 701, 707 (Miss. 2005). *See also Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); *Grannis v. Ogden*, 234 U.S. 385, 394, 34 S. Ct. 779, 58 L. Ed. 1363 (1914) (parties denied "'the opportunity to be heard[]' . . . at a meaningful time and in a meaningful manner"). Therefore, we reverse the March 5, 2013, Order granting the rate increases and order the Commission to enter an order directing that the funds be refunded to the ratepayers. The Commission is instructed further to provide notice to the ratepayers in future proceedings related to rate base, rates, rate of return, and prudency hearings. We otherwise remand to the Commission for proceedings consistent with this opinion.

¶27. **REVERSED AND REMANDED.**

**LAMAR, KITCHENS AND KING, JJ., CONCUR. PIERCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND LAMAR, J. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., CHANDLER AND COLEMAN, JJ.**

**PIERCE, JUSTICE, SPECIALLY CONCURRING:**

¶28. I concur with the majority decision, but I write separately to provide additional analysis regarding the interplay between public utility regulation and the subject Base Load Act. In authorizing the Commission to include in an electric utility's rate base and rates all cost expenditures determined by the Commission to be prudently incurred in connection with

a generating facility, the Base Load Act sanctions the prudent investment theory that arose out of a series of United States Supreme Court decisions–culminating with the Court's landmark decision in *Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 2d 333 (1944). By allowing recovery of such costs, regardless of whether the generating facility is ever placed into service, the Base Load Act advances this particular regulatory theory to the nth degree. This undoubtedly takes us into new and unchartered territory–which warrants discussion.

¶29. Like any business, a utility company is a "profit making enterprise, run by [businesspeople, who] no doubt . . . seek to charge the rate [they think] the traffic will bear." *Miss. Power Co. v. Goudy*, 459 So. 2d 257, 271 (Miss. 1984) (Hawkins, J., specially concurring). But, unlike most other businesses, it is precluded from doing so. Based on principles of English common law, government has the right to regulate businesses charged with a public interest, for reasons discussed by the United States Supreme Court in *Munn v. Illinois*, 94 U.S. 113, 134, 24 L. Ed. 77 (1876), the case which marked the beginning of the constitutional price-regulation doctrine in this country, with its holding that Illinois had the power to fix the prices charged by grain- elevator operators.[20] On the other hand, because

---

[20] *Munn* explained:

> This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is "affected with a public interest, it ceases to be juris privati only." This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise *De Portibus Maris*, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever

19

it is allowed monopoly status, the utility company, in large measure, is immune from the natural forces of competition that regulate prices in the open market. In trade for this privilege, the utility is allowed to charge only rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. ***State ex. rel. Allain v. Miss. Pub. Serv. Comm'n***, 435 So. 2d 608, 612 (Miss. 1983).

¶30.    Under Mississippi law, the consumer has the "unquestionable right" that the rates charged by a monopoly will be fair and reasonable. Miss. Code Ann. § 77-3-33 (Rev. 2009);

---

since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control.

Thus, as to ferries, Lord Hale says, in his treatise *De Jure Maris*, 1 Harg. Law Tracts, 6, the king has "a right of franchise or privilege, that no man may set up a common ferry for all passengers, without a prescription time out of mind, or a charter from the king. He may make a ferry for his own use or the use of his family, but not for the common use of all the king's subjects passing that way; because it doth in consequence tend to a common charge, and is become a thing if public interest and use, and every man for his passage pays a toll, which is a common charge, and every ferry ought to be under a public regulation, viz., that it give attendance at due times, keep a boat in due order, and take but reasonable toll; for if he fail in these he is finable." So if one owns the soil and landing-places on both banks of a stream, he cannot use them for the purposes of a public ferry, except upon such terms and conditions as the body politic may from time to time impose; and this because the common good requires that all public ways shall be under the control of the public authorities. This privilege or prerogative of the king, who in this connection only represents and gives another name to the body politic, is not primarily for his profit, but for the protection of the people and the promotion of the general welfare.

***Munn v. Ill.***, 94 U.S. at 125-126.

*Goudy*, 459 So. 2d at 273 (Hawkins, J., specially concurring). And the utility has the "unquestionable right" to receive a fair and reasonable return for the services it renders. *Id.* The inherent complexities faced by the Commission in trying to balance these rights cannot be exaggerated, as this Court articulated in *Allain*, 435 So. 2d at 612:

> The duties of the Commission are awesome and their responsibilities great in a most difficult, ongoing situation. Mississippi Code Annotated, § [77-3-33], authorizes the Commission to establish rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. In effect the Commission is the counterpart of the market place by which other businesses are measured. This is so because public utilities are monopolies engaged in the business of furnishing necessary services to the public. Obviously, the legislative intent in creating the [Commission] was to interpose an authoritative body between the rate payers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served.

¶31. Since the passage of the Public Utilities Act of 1956 ("1956 Act"), the Commission has rejected construction-work-in-progress (CWIP) costs from rate bases in almost every instance where the item was proposed,[21] for these reasons: (1) CWIP costs were not "used and useful in the rendition of [utility] service to rate payers[;]" and "it was not the general practice of this jurisdiction to include CWIP in the rate base." *Miss. Pub. Serv. Comm'n v. Miss. Power Co.*, 429 So. 2d 883, 897 (Miss.1983). (2) The utility company suffered no

---

[21] An exception is in the case of *State ex rel. Pittman v. Mississippi Public Service Commission*, 538 So. 2d 367 (Miss. 1989), in which the Commission adopted a performance formula rate plan proposed by MPC, which contained a provision allowing MPC to include CWIP costs in rate bases without any allowance for funds used during construction (AFUDC), for all projects commenced after July 1, 1987. Without speaking to the CWIP provision itself, this Court reversed the Commission, finding that the Commission had acted outside its statutory authority by adopting the rate plan. *See id*. at 373 (adoption of the rate plan, itself, was an "utter abrogation by the Commission of its statutory responsibilities and a relinquishment of control to the very entity the Commission is charged by law to regulate").

injustice from having CWIP costs excluded from the rate base, because, after construction work is completed and the plant is put into service, its entire cost, including interest, taxes, and overhead, is capitalized, and these costs could then be added to the utility's rate base. *United Gas Corp. v. Miss. Pub. Serv. Comm'n*, 240 Miss. 405, 127 So. 2d 404 (1961). (3) Requiring ratepayers to pay a utility a return on CWIP costs is inequitable, because this would force current ratepayers to pay a return on property constructed for future ratepayers–with the result that, when the future ratepayers begin to receive the new, upgraded service, the utility would derive a double return on the cost of construction. *Southern Bell Tel. & Tel. Co. v. Miss. Public Serv. Comm'n*, 237 Miss. 157, 113 So. 2d 622 (1959).

¶32. We affirmed the Commission's decision to exclude CWIP costs from the rate base in each mentioned case under our limited standard of review, without any real discussion why. The "used and useful" language relied upon by the Commission for excluding CWIP is an important concept in utility regulation and requires discussion.

¶33. The language was included in the 1956 Act through the predecessor to Section 77-3-33, Section 7716-08 of the Mississippi Code 1942 (1956), which reads:

> No rate made, deposit or service charge demanded or received by any public utility shall exceed that which is just and reasonable. Such public utility, the rates of which are subject to regulation under the provisions of this article, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the commission shall be such as to yield a fair rate of return to the utility furnishing service, upon reasonable value of the property of the utility used or useful in furnishing service.

It was added to Mississippi Code Section 77-3-43 in 1983, when that Section was amended, as shown by the following (highlighted) language:

22

In regulating the rates of any public utility subject to the provisions of this chapter, the commission shall, on hearing after reasonable notice, ascertain and fix the rate base of the property of the public utility in such manner as to be fair both to the public utility and to the consumer when the same is relevant or material to the exercise of the jurisdiction of the commission. The commission shall make readjustments from time to time, and ascertain the cost of all new construction, extensions and additions to the property of every public utility. *In arriving at such rate base, the commission shall give due consideration to: (a) the reasonable original costs of the property **used and useful, or to be used and useful** within a reasonable time after the test period; (b) the portion of the cost which has been consumed by previous use recovered by depreciation expense; (c) the allowance for funds used during construction [AFUDC], not to exceed on borrowed funds the true net interest cost of such funds, computed according to the actuarial method, and, on the equity component thereof, a rate of return granted on common equity in the last rate proceedings before the commission, or if such rate has not been established within the preceding three (3) years, then the average rate of return actually earned on equity during the preceding three (3) years; (d) any other elements deemed by the commission to be material in determining the rate base for rate-making purposes.*

The "used and useful" language is carried over into the new Base Load Act through Mississippi Code Section 77-3-105(1)(a), which reads:

The commission is fully empowered and authorized to include in an electric public utility's rate base and rates, as used and useful components of furnishing electric service, all expenditures determined to be prudently-incurred pre-construction, construction, operating and related costs that the utility incurs in connection with a generating facility (including but not limited to all such costs contained in the utility's "Construction Work in Progress" or "CWIP" accounts), whether or not the construction of any generating facility is ever commenced or completed, or the generating facility is placed into commercial operation.

¶34. Most authorities regard the "used and useful" language, conceptually, as having derived from the United States Supreme Court's decision in ***Smyth v. Ames***, 196 U.S. 466, 546, 18 S. Ct. 418, 42 L. Ed. 819 (1898), in which the Court held that:

[T]he basis of all calculations as to the reasonableness of rates to be charged by a [public utility] must be *the fair value of the property being used by it for*

23

*the convenience of the public. . . .* What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it . . . than the services rendered by it are reasonably worth.

*Id*. at 546-47 (emphasis added). The concept, however, was also expressed in **Munn**, where the Supreme Court spoke to an English case, **Aldnutt v. Inglis**, 12 East, 527, decided in 1810, in which the question was presented whether the London Dock Company could charge arbitrary rates for storing imported wines, after having obtained authority under the general warehousing act to engage in such services. **Munn**, 94 U.S. at 127. **Munn** noted:

¶35.    Upon this point, Lord Ellenborough said:

There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms. The question then is, whether, circumstanced as this company is, by the combination of the warehousing act with the act by which they were originally constituted, and with the actually existing state of things in the port of London, whereby they alone have the warehousing of these wines, they be not, according to the doctrine of Lord Hale, obliged to limit themselves to a reasonable compensation for such warehousing. And, according to him, *whenever the accident of time casts upon a party the benefit of having a legal monopoly of landing goods in a public port, as where he is the owner of the only wharf authorized to receive goods which happens to be built in a port newly erected, he is confined to take reasonable compensation only for the use of the wharf.*

**Aldnutt v. Inglis**, 12 East, 527, 537 (1810) (emphasis added).

¶36.    After **Smyth**, it was believed that the United States Constitution required rates to be set according to the actual present value of the assets employed in public service–a precedent known as the "fair value" rule. **Duquesne Light Co. v. Barasch**, 488 U.S. 299, 308, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989). **Smyth** analogized ratemaking with eminent-domain

24

principles. *Smyth*, 169 U.S. at 544. And the "fair value" rule necessitated that property be "used and useful" before it could be included in the rate base. *Glustrom v. Colorado Pub. Utils. Comm'n*, 280 P. 3d 662, 669 (Colo. 2012) (citing *Denver Union Stock Yard Co. v. U.S.*, 304 U.S. 470, 475, 58 S. Ct. 990, 82 L. Ed. 1469 (1938)). As the United States Court of Appeals for the District of Columbia explained:

> Under [*Smyth*], courts had [to] meticulously scrutinize[] rate orders to ensure that investors received the "fair value" of the property dedicated to public use. The "fair value" standard required courts to estimate the current market value of the property, and rates that provided anything less were deemed confiscatory. The governing theory required that consumers pay the market value of the property they were using because the property was regarded as having been taken. *Recovery was therefore required only on property "used and useful" to the public, for property that was not being used could not be considered to have been taken.*

*Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168, 1176 (D.C. Cir. 1987) (emphasis added).

¶37. *Smyth*'s "fair value" rule functioned adequately until World War I, when tremendous inflation skewed the valuation of utility property upward to the point that ratemaking valuation of utility property greatly exceeded the actual amount of investment capital in the utility. Application of *Diamond State Tel. Co.*, 9 Terry 317, 103 A.2d 304 (Del. Super. 1954). "The *Smyth* rule resulted in such high constitutional limits on rates that most utilities were satisfied with rates below the constitutional minimum." John N. Drobak, *From Turnpike to Nuclear Power: The Constitutional Limits on Utility Rate Regulation*, 65 B.U.L. Rev. 65 (1985). "The *Smyth* rule came to mean that utility companies could charge what the market would bear, and government was constitutionally unable to moderate their charges in order to protect the public from excessive charges." *Id.*

25

¶38. Economists and legal commentators soon became critical of *Smyth* because the "fair value" rule produced arbitrary and fluctuating results. And in his classic concurrence in *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 43 S. Ct. 544, 67 L. Ed. 981 (1923), Justice Brandeis began the Supreme Court's attempt to correct the ratemaking problems caused by *Smyth*. *Southern Bell*, 113 So. 2d at 645-46. Justice Brandeis urged the Court to replace the "fair value" rule with a principle that gave the utility the opportunity to earn a fair return on the amount prudently invested in it. *Missouri*, 262 U.S. at 306-07.

¶39. In 1942, the Supreme Court overruled much of *Smyth* with its holding in *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S. Ct. 736, 86 L. Ed. 1037 (1942) (construing the Natural Gas Act of 1938), that "[t]he Constitution does not bind rate-making bodies to employ any single formula or combination of formulas" in regulating rates. Two years later, in the landmark decision *Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 288, 88 L. Ed. 2d 333 (1944), the Supreme Court decisively abandoned the "fair value" rule by reasoning that: "Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called 'fair value' rate base." *Hope*, 320 U.S. at 605. *Hope* explained that:

> From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. . . . By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks.

26

*Id*. at 603. The Court instructed that: "The rate-making process . . ., i.e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." *Hope*, 320 U.S. at 590.

¶40. As recognized by this Court in *Southern Bell*, the leading case in Mississippi on utility ratemaking, *Hope* "radically altered the course of utility regulation" throughout the country with its holding that, under the statutory standard of just and reasonable, it is not the method employed that is controlling, but the end result reached. *Southern Bell,* 113 So. 2d at 647. *Southern Bell* explained that:

> The effect of the decision in the *Hope* case was to free the state commissions as far as the Federal Constitution was concerned from any restriction in their choice of a rate base. Many state courts and commissions turned from fair value to original cost, although elsewhere fair value continued as the accepted rate base, not because of Federal constitutional requirements but because of state law.

*Southern Bell*, 113 So. 2d at 647.

¶41. The used-and-useful principle was relegated to one of multiple theories or tests by *Hope*'s end-result standard. And the principle no doubt has been blurred by the accession of modern ratemaking. As one commentator points out, the U.S. Court of Appeals for the D.C. Circuit "struggled mightily" with the application of the used-and-useful principle in three successive *Jersey Central Power & Light Co. v. FERC* decisions dealing with a canceled nuclear power plant–all majority opinions authored by Judge Robert H. Bork.[22] *See*

----

[22] *Jersey Central Power & Light Co. v. FERC*, 730 F.2d 816 (D.C. Cir. 1984) (*Jersey Central I*) (unanimously affirming the Commission's summary denial of Jersey Central Power & Light's (JCP&L) application to recover $397 million prudently invested in a later-abandoned nuclear plant); *Jersey Central Power & Light Co. v. FERC*, 768 F.2d 1500 (D.C. Cir. 1985) (*Jersey Central II*) (remanding the case because of the Commission's

James J. Hoecker, *"Used and Useful": Autopsy of a Rate Making Policy*, 8 Energy Law

Journal 303 (1987). In *Jersey Central (III)*, Judge Bork said:

> In addition to prohibiting rates so low as to be confiscatory, the holding of [*Hope*] makes clear that exploitative rates are illegal as well. If the inclusion of property not currently used and useful in the rate base automatically constituted exploitation of consumers, as one of the amici maintains, then the Commission would be justified in excluding such property summarily even in cases where the utility pleads acute financial distress. A regulated utility has no constitutional right to a profit, *see FPC v. Natural Gas Pipeline Co.*, 315 U.S. at 590, 62 S. Ct. at 745, and a company that is unable to survive without charging exploitative rates has no entitlement to such rates. *Market Street Ry. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 65 S. Ct. 770, 89 L. Ed. 1171 (1945). But we have already held that including prudent investments in the rate base is not in and of itself exploitative, *Washington Gas Light Co. v. Baker*, and no party has denied that the Forked River investment was prudent. Indeed, when the regulated company is permitted to earn a return not on the market value of the property used by the public, *see Smyth v. Ames*, but rather on the original cost of the investment, placing prudent investments in the rate base would seem a more sensible policy than a strict application of "used and useful," for under this approach it is the investment, and not the property used, which is viewed as having been taken by the public. The investor interest described in *Hope*, after all, is an interest in return on investment. *Hope*, 320 U.S. at 603.

*Jersey Central (III)*, 810 F.2d at 1180-81.

¶42. Here, there are compelling arguments on both sides for why CWIP costs should or should not be allowed in the rate base.[23] As mentioned, prior to the Base Load Act,

---

failure to explain how its summary application of its used-and-useful rule affected the overall end result of the rate, later vacated in favor of en banc review in *Jersey Central Power & Light v. FERC*, 776 F.2d 364 (1985)); *Jersey Central*, 810 F.2d 1168 (*Jersey Central III*) (vacating and remanding the Commission's order for failure to inquire under *Hope*, whether a rate that excludes recovery of the investment in the abandoned plant is just and reasonable in light of its effect on the investors in the financially distressed utility).

[23] *See, e.g.,* Neufeld, *CWIP: Shifting the Investment Risk to Utilities' Consumers* (1979), available at http://www.nccppr.org/drupal/content/insightarticle/991/cwip-shifting-the-investment-risk (last accessed February 6, 2015).

Mississippi traditionally did not allow CWIP, because such costs were not considered used and useful in the rendition of utility service to existing ratepayers. Under this precept, CWIP was considered inequitable because it allowed a double return for the utility. Ostensibly, though, with the advent of AFUDC method accounting and other modern regulatory theories, the double-return concern has likewise been downgraded–as CWIP could still potentially be more beneficial to the ratepayer. But, with AFUDC, the risk of loss from an abandoned project remained with the utility and its investors. Even after a plant went into service and the AFUDC was capitalized and included in the rate base, the risk of loss still remained with the utility company and its investors if the plant were aborted for whatever reason. This is because of the used-and-useful principle.

¶43.   The difficulties that confronted the D.C. Circuit in the *Jersey Central* trilogy illustrate that, despite the demise of *Smyth's* fair-value rule, "the 'used-and-useful' principle, enunciated [by *Smyth*], has stood as a bedrock principle of utility rate regulation." *Kentucky Utils. Co. v. F.E.R.C.*, 760 F.2d 1321, 1324 n.4 (C.A.D.C. 1985). The simplicity of its basics (quid-pro-quo concept) has been recognized and understood by courts going back to the regulation of ferry boats and port facilities by the kings of England. *See* Hoecher, *"Used and Useful": Autopsy of a Rate Making Policy*, 8 Energy Law Journal 303 (1987) (citing Lord Hale, *De Jure Maris & Brachiorum Ejusdem*, in 1 Harg. Law Tracts 6-8 (1787)). The consumer pays for what he or she gets and gets what he or she pays for.

¶44.   The Base Load Act effectively abandons the traditional notion of "used and useful" by characterizing CWIP as a "used and useful component" of furnishing utility service. *See* Miss. Code Ann. § 77-3-105(1)(a). For our purposes, we are judges–not utility experts. We

29

may only review the methods and results of the Commission's activity. Our role, though, based on the dictates of the Public Utilities Act, remains: to ensure that the utility rates *are lawfully established and that they are fair, just and reasonable, based on the evidence.*

¶45. What the Legislature has left in place, however, with the adoption of the Base Load Act, is the Commission's duty under Sections 77-3-33 and 77-3-43 to establish a fair, just and reasonable rate base, which requires the Commission to consider and balance the interests of the utility company, its investors, and the ratepayers. Based on the strictures of Sections 77-3-33 and 77-3-43, exploitive rates are illegal in Mississippi. How the scope of Sections 77-3-105(1)(a), (2)(a), and (1)(b) can be squared with the mandates of Sections 77-3-33 and 77-3-43, we do not (nor cannot) know at this juncture.

**RANDOLPH, P.J., AND LAMAR, J., JOIN THIS OPINION.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶46. Before 2008, public power utilities were allowed to raise their customers' rates to pay for the construction of new power-generation plants after the plants began to generate electricity. The Mississippi Baseload Act now allows the Public Service Commission to approve rate increases while construction of the plants is in progress (CWIP), before they begin to generate electricity.[24]

¶47. In order to construct a new power generation plant in Kemper County, Mississippi Power Company sought and obtained the Commission's approval to raise its rates during construction. The case before us involves one Mississippi Power customer—Thomas Blanton—who makes four claims related to that rate increase.

---

[24] Miss. Code Ann. §§ 77-3-101 to 77-3-109 (Rev. 2009).

30

¶48.   First, he argues that raising his rates during construction of the Kemper plant, before it begins to deliver electricity, amounts to an unconstitutional and illegal tax.  Second, he claims CWIP assessments under the Mississippi Baseload Act violate due process because, through the rate increases, Mississippi Power is taking his property without affording him notice and an opportunity to be heard.  Third, he claims that the rate increase violates Article 14, Section 258 of the Mississippi Constitution, which prohibits pledging the credit of the State of Mississippi "in aid of any person, association, or corporation . . . ."  And fourth, he claims that a settlement agreement reached between Mississippi Power and the Commission should be set aside because he was not allowed to participate in it; because Mississippi Power had ex parte communications with the Commission in violation of Section 77-2-13; and because the only notice he received of the agreement was posted on the Commission's website.

¶49.   The majority opinion rests on two conclusions.  First, the majority believes every ratepayer is entitled to individual notice of every rate proceeding before the PSC.  While this may or may not be true, Blanton is the only aggrieved party in this appeal, and he actively participated in this rate proceeding since the beginning and at every stage.

¶50.   Second, the majority concludes that Mississippi Code Section 77-3-105 requires prudency findings before a rate increase based on CWIP recovery.  But Blanton argued that Mississippi Power Company's proposed rate schedule should have been dismissed for the four reasons stated above, and he moved to dismiss the proposed rate schedule for those four reasons alone.  He made no other challenge to the Commission's decision to grant CWIP recovery.  So I will address the questions he actually raised below.

31

**ANALYSIS**

¶51.    This Court will not reverse administrative agencies' decisions unless we find them to be arbitrary, capricious, unsupported by substantial evidence, outside the scope of the agency's authority, or illegal or unconstitutional.[25]    Appellants who raise constitutional challenges are "burdened with carrying [their cases] beyond a reasonable doubt before this Court has authority to hold the statute, in whole or in part, of no force or effect."[26]

¶52.    When, as here, we are required to review the Legislature's authority to enact a particular law, we must remain cognizant of the grant of legislative power in our Mississippi Constitution.    Unlike the United States Congress, which possesses only those powers specifically enumerated and delegated to it by the United States Constitution,[27] our state Legislature possesses plenary power to enact any law that is not prohibited by the Mississippi Constitution or in violation of an individual right guaranteed by the Mississippi or United States Constitutions.[28]

¶53.    So, to prevail in this case, Blanton's hill is steep.    He must cite some specific constitutional provision precluding the Legislature's decision to allow utilities to collect their

---

[25] ***BellSouth Telecomm., Inc. v. Mississippi Pub. Serv. Comm'n***, 18 So. 3d 199, 201 (Miss. 2009) (citing ***Town of Enterprise v. Mississippi Pub. Serv. Comm'n***, 782 So. 2d 733, 735 (Miss. 2001)).

[26] ***State v. Mississippi Ass'n of Supervisors, Inc.***, 699 So. 2d 1221, 1223 (Miss. 1997).

[27] ***United States v. Morrison***, 529 U.S. 598, 607, 120 S. Ct. 1740, 1748, 146 L. Ed. 2d 658 (2000).

[28] ***Moore v. Gillis***, 205 Miss. 865, 888, 89, 39 So. 2d 505 (1949) (citing ***Farrar v. State***, 191 Miss. 1, 2 So. 2d 146 (1941)).

financing costs of construction prior to the project's completion. Much of the parties' dispute stems from a disagreement as to whether these financing costs should be considered a tax or a utility rate. But, because Blanton has failed to meet his burden to show that the Base Load Act violates the Constitution—regardless of whether the CWIP allowance constitutes a tax or a rate—I will not address that question.

## I. CWIP allowance is not an unconstitutional or illegal tax.

¶54. First, Blanton argues that, when the Commission exercised its authority under the Mississippi Base Load Act to include CWIP recovery in utility rates, it imposed an unconstitutional and illegal tax on rate payers. Blanton cites three constitutional provisions and one statute in support of that argument. He first cites Section 112 of the Mississippi Constitution, which states that "[t]axation shall be uniform and equal throughout the State."[29] But, because we clearly have held that Section 112 applies *only* to property taxes,[30] I must reject this argument without further analysis.

¶55. Next, Blanton cites Section 80, which states:

Provisions shall be made by general laws to prevent the abuse by cities, towns, and other municipal corporations of their powers of assessment, taxation, borrowing money, and contracting debts.[31]

---

[29] Miss. Const. art. 4, § 112.

[30] *Southern Package Corp. v. State Tax Comm'n*, 174 Miss. 212, 164 So. 45, 46 (1935).

[31] Miss. Const. art. 4, § 80.

¶56. Blanton does not argue—and he cites no authority to support the proposition—that either the Commission or Mississippi Power falls within the definition of "cities, towns, and other municipal corporations." So Section 80 also is equally inapplicable.

¶57. Third, Blanton cites Article 6, Section 172A, which states:

> Neither the Supreme Court nor any inferior court of this State shall have the power to instruct or order the State or any political subdivision thereof, or an official of the State or a political subdivision, to levy or increase taxes.[32]

¶58. Blanton provides little explanation as to how this provision applies. It was the Legislature—not this Court—that authorized the Commission to approve the CWIP allowance. Section 172A prevents a *court* from ordering a political subdivision to levy a tax, and no court has levied any tax in this case. Accordingly, this argument is without merit.

¶59. Finally, Blanton argues that CWIP constitutes an illegal tax because it violates Section 7-9-19,[33] which requires that "[a]ll taxes, fees and penalties that may be hereafter collected for or in the name of the State of Mississippi shall be paid direct to the Treasurer of the state . . . ."[34] And because customers pay CWIP directly to Mississippi Power, rather than to the Treasurer, Blanton argues that the CWIP collection process is illegal.

¶60. Even assuming *arguendo* that CWIP is a tax, this merely would present conflicting statutes. Both the Baseload Act and CWIP recovery conflict with Section 7-9-19. But this Court has held that:

---

[32] Miss. Const. art. 4, § 172A.

[33] Miss. Code Ann. § 7-9-19 (Rev. 2002).

[34] *Id.*

34

in resolving the conflict of specific versus general statutory provisions: "To the extent that two constitutional or statutory provisions overlap or conflict, specific provisions control over general provisions."[35]

And because the Baseload Act—which specifically provides the Commission authority to authorize Mississippi Power to collect CWIP—is more specific than Section 7-9-19's general taxing provision, the Baseload Act would govern.

¶61. Neither the constitutional provisions nor the statute cited by Blanton prevent the Legislature from exercising its plenary power and authority to authorize CWIP recovery, even were we to assume CWIP imposes a tax. Accordingly, Blanton has failed to carry his burden to show beyond a reasonable doubt that some constitutional provision would preclude CWIP recovery even if CWIP recovery imposes a tax.

## II.   CWIP assessments under the Mississippi Baseload Act do not violate Blanton's due-process rights.

¶62. Next, Blanton argues that, because CWIP imposes a tax, these assessments deprive him of money without any guaranteed connection to a public benefit and violate his substantive due-process rights. In his original cross-appeal, Blanton also argued that, because the Commission conducted proceedings without individual notice to ratepayers, it violated his procedural due-process rights.

¶63. Mississippi Power and the Commission argue that Blanton lacks a protected property interest in any certain utility rate and cite our opinion in *Mississippi Power Company v. Goudy*, in which a utility ratepayer claimed that Section 77-3-33 violated due process

_____

[35] *Harrison v. State*, 800 So. 2d 1134, 1137 (Miss. 2001) (quoting *Yarbrough v. Camphor*, 645 So. 2d 867, 872 (Miss. 1994); *McCrory v. State*, 210 So. 2d 877, 877-79 (Miss. 1968); *Lenoir v. Madison*, 641 So. 2d 1124, 1128 (Miss. 1994)).

because it allowed utility companies to change rates subject to refund under bond, pending a determination by an administrative entity or court, with no procedural rights for ratepayers.[36] We upheld the statute because a ratepayer has no property interest that would implicate due-process protections in reasonable utility rates.[37] Accordingly, if CWIP constitutes a utility rate as the Commission argues, Blanton lacks a property interest subject to due-process protections.

¶64. But Blanton attempts to distinguish *Goudy* by arguing that CWIP assessments impose a tax and therefore constitute takings by the government. This taking through a tax, he argues, violates his protected property interest in money.[38] Were I to agree with Blanton that CWIP imposes a tax, still, he would be unable to succeed on his due-process claim. This Court rejected a similar due-process attack in *Albritton v. City of Winona*,[39] in which the statute that created the Mississippi Industrial Commission allowed it to authorize the use of municipal taxes to purchase land and facilities that then would be leased to individuals or

---

[36] *Mississippi Power Co. v. Goudy*, 459 So. 2d 257, 259 (Miss. 1984).

[37] *Id.* at 263.

[38] Blanton also points us to *State ex rel. Pittman v. Mississippi Public Service Commission*, in which we held that the Commission could not approve—and the power company could not recover—utility rates for profits lost during a hurricane, because it would compensate the power company for services never provided to the ratepayer. *State ex rel. Pittman v. Pub. Serv. Comm'n*, 520 So. 2d 1355, 1363 (Miss. 1987). However, our holding in that case was based on the Commission's statutory authority and was completely unrelated to due process. Blanton, however, challenges a Commission decision specifically authorized by statute.

[39] *Albritton v. City of Winona*, 181 Miss. 75, 178 So. 799 (Miss. 1938).

corporations for industrial use.[40] There, we found that the only limit on the State's authority in this respect is that the policy must not be arbitrary,[41] and that using a tax to acquire property to be leased to industry was not arbitrary because it reasonably related to the purposes of promoting the development of industry and reducing unemployment.[42]

¶65. Here, Blanton correctly argues that the Kemper Plant lacks guaranteed success. Mississippi Power admitted as much at oral argument. And it is quite possible that, even if the plant is successful, it may not result in lower utility rates for Blanton. But the Legislature's stated purposes for the Baseload Act do not include lowering a customer's future utility rates. Section 77-3-101 sets out the State's need to promote the expansion of electrical power generation, and that availability of electricity is vital to economic growth. It also states that new power-generating technologies are an important part of needed growth, that additional investment in power infrastructure is necessary to take advantage of certain financial incentives, and that energy independence for the State is an important goal.[43]

¶66. In *Albritton*, we held that the State may invest tax money in the development of industry.[44] So, even if CWIP imposes a tax, I cannot say that the investment of tax revenues in the construction of a power plant that proposes to use new technology for generating electricity for future generations is unrelated to the Legislature's stated public-policy

[40] *Id.* at 801.

[41] *Id.* at 805.

[42] *Id.* at 805.

[43] Miss. Code Ann. § 77-3-101 (Rev. 2009).

[44] *Albritton*, 178 So. at 805.

purposes for allowing the Commission to approve CWIP.[45]  Accordingly, I cannot find that the Baseload Act is arbitrary if, as Blanton argues, it is a tax.

¶67.   Therefore, Blanton's substantive due-process claims fail regardless of whether I consider CWIP a tax or a utility rate.

¶68.   As to Blanton's procedural due-process challenge, he cites *Londoner v. City and County of Denver* to support his argument that CWIP denies Mississippi Power customers' right to procedural due process.  In *Londoner*, the city council of Denver, Colorado, delegated to an equalization board the job of setting a tax on property owners to be used in paving a roadway abutting their property.[46]  The United States Supreme Court—noting that the property owners were given neither notice nor an opportunity to be present at a hearing on the issue,[47] and that Colorado law provided landowners no right to challenge the taxes in court[48]—held that due process required either personal notice or notice by publication and a hearing.[49]

¶69.   *Londoner* has no application here. Both Mississippi Power and the Commission point out that Blanton has participated actively in this litigation at every stage.  And he has forcefully challenged both the constitutionality of CWIP and the public-policy use of the

---

[45] Miss. Code Ann. § 77-3-101(a) (Rev. 2009).

[46] *Londoner v. City and County of Denver*, 210 U.S. 373, 385, 28 S. Ct. 708, 52 L. Ed. 1103 (1908).

[47] *Id.*

[48] *Id.*

[49] *Id.* at 385.

proceeds. He does not allege that, because of a lack of notice or hearing, he has been deprived of making any argument or any challenge to CWIP. Further, the dictates of *Londoner* have been satisfied, because notice of the rate proceedings was provided by publication.

### III. CWIP assessments under the Mississippi Baseload Act do not unconstitutionally pledge the credit of the State of Mississippi in aid of a corporation.

¶70. Blanton next directs us to Section 258 of the Mississippi Constitution, which prohibits the State from pledging its credit in aid of a corporation.[50] He suggests that when the state imposed CWIP on ratepayers to support the Kemper construction project, it somehow pledged the state's credit to protect Mississippi Power's credit rating.

¶71. Section 258 states:

> The credit of the state shall not be pledged or loaned in aid of any person, association, or corporation; and the state shall not become a stockholder in any corporation or association, nor assume, redeem, secure, or pay any indebtedness or pretended indebtedness alleged to be due by the state of Mississippi to any person, association, or corporation whatsoever, claiming the same as owners, holders, or assignees of any bond or bonds, now generally known as "Union Bank" bonds and "Planters Bank" bonds.[51]

¶72. Once again, assuming *arguendo* that CWIP recovery is a tax, we must look to our opinion in *Albritton*, in which we held that the use of municipal taxes to purchase land and facilities to be leased to corporations for industrial use did not violate Section 258, because

---

[50] Miss Const. art. 15, § 258.

[51] Miss Const. art. 15, § 258.

the expenditure of public revenue served the legitimate public purpose of economic development.[52]

¶73. Likewise, in *Craig v. North Mississippi Community Hospital*, we found that Section 258 did not preclude the State from spending public funds to support a private, nonprofit hospital because of the State's interest in providing healthcare to indigent patients.[53] And in *Chance v. Mississippi State Textbook Rating and Purchasing Board*, we held that, consistent with Section 258, the State could provide free textbooks to private schools.[54]

¶74. As discussed above, CWIP supports legitimate governmental interests, including the development and use of new technologies to expand energy production within the State. Accordingly, even if I accepted Blanton's argument that CWIP recovery is a tax, his argument still fails. Further, Blanton cites no case in which this Court has struck down a similar provision under Section 258. Accordingly, I would hold that the State's imposition of CWIP does not violate Article 14, Section 258 of the Mississippi Constitution.

IV. **Any ex parte contact between the Commission and Mississippi Power during settlement negotiations does not invalidate the Settlement Agreement or the Commission's subsequent approval of CWIP recovery.**

¶75. Blanton claims that the settlement negotiations between the Commission and Mississippi Power violated Mississippi Code Section 77-2-13's prohibition of ex parte contact in contested Commission proceedings. Accordingly, he argues that the contact

---

[52] *Albritton*, 178 So. at 809, 810.

[53] *Craig v. North Miss. Cmty. Hosp.*, 206 Miss. 11, 39 So. 2d 523, 529 (Miss. 1949).

[54] *Chance v. Miss. State Textbook Rating and Purchasing Bd.*, 190 Miss. 453, 200 So. 706, 711 (1941).

renders the settlement agreement and second rate proceeding invalid. Blanton requests that this Court vacate the settlement agreement, the second rate proceeding, and the resulting CWIP approval. I disagree.

¶76. Section 77-2-13 states:

> A public service commissioner, commission or public utilities staff employee, or consultant assisting the commission in investigating, compiling, evaluating and analyzing the record shall not communicate, directly or indirectly, regarding any issue in a contested proceeding other than communications necessary to procedural aspects of maintaining an orderly process, with any commission employee or consultant who has participated in the proceeding in a public advocacy or prosecutorial capacity, any party, his agent or other person acting on his behalf who has a direct or indirect pecuniary interest in the outcome of the proceeding, without notice and opportunity for all parties to participate.[55]

¶77. Blanton claims that the entire Commission violated this provision when it engaged in settlement negotiations without allowing him to participate. These negotiations occurred during Mississippi Power's appeal of the Commission's denial of its proposed rate increase.

¶78. The Commission and Mississippi Power argue that they did not violate Section 77-2-13 because the communications occurred during an appeal of the Commission's final order. Accordingly, they suggest that the communications were not "regarding any issue in a *contested proceeding*" before the Commission.[56] Blanton argues that the Commission should not now be heard to argue that its order was final, when previously it argued the opposite to this Court, claiming that because its order was *not* final, Mississippi Power had no right to appeal.

---

[55] Miss. Code Ann. § 77-2-13(1) (Rev. 2009).

[56] *Id.*

41

¶79.    While I find it interesting that the Commission would now choose to defend against this claim by asserting that its original order denying Mississippi Power's proposed rate increase was indeed final, when it vigorously argued the opposite in the original appeal, I conclude that Blanton's argument fails for a different reason.

¶80.    Section 77-2-13 provides that relief for a violation of the statute shall be granted when "necessary to ensure that such violation does not prejudice any party or adversely affect the fairness of the proceedings."[57]    Blanton does not claim or show that the settlement negotiations caused him prejudice or rendered these proceedings unfair.  Despite the fact that the settlement resulted in a dismissal of Mississippi Power's original appeal, we allowed him to continue with his cross-appeal.  The ex parte communications and settlement agreement have in no way prejudiced Blanton's opportunity or ability to litigate his claims.

¶81.    Because I find that all of Blanton's contentions from the rate proceedings below lack merit, I would affirm the Commission's decision.

**WALLER, C.J., CHANDLER AND COLEMAN, JJ., JOIN THIS OPINION**.

---

[57] Miss. Code Ann. § 77-2-13(4) (Rev. 2009).

42